UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHRISTINA GRACE, et al.,<br><br>       Plaintiffs,<br><br>   v.<br><br>APPLE, INC.,<br><br>       Defendant. | Case No. 17-CV-00551-LHK<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE**<br><br>Re: Dkt. Nos. 174, 233 |

Plaintiffs Christina Grace ("Grace") and Ken Potter ("Potter") (collectively, "Plaintiffs") bring this putative class action against Defendant Apple, Inc. ("Apple") for trespass to chattels and violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200. Before the Court is Plaintiffs' motion for class certification and Plaintiffs' motion to strike the report of Apple's technical expert. Having considered the parties' submissions, the relevant law, and the record in this case, the Court GRANTS in part and DENIES in part Plaintiffs' motion for class certification, and DENIES Plaintiffs' motion to strike.

## I.    BACKGROUND

### A.  Factual Background

### 1. Apple's iPhone 4 and iPhone 4S and Apple's FaceTime

Apple is the designer, seller, and manufacturer of the iPhone smartphone. ECF No. 36 (First Amended Complaint, or "FAC") ¶ 29. Apple released the iPhone 4 device on June 7, 2010. *Id.* ¶ 31. Apple released the iPhone 4S device on October 14, 2011. *Id.* ¶ 32.

All iPhones, including the iPhone 4 and iPhone 4S, operate through a mobile operating system known as iOS. *Id.* ¶ 34. iOS runs the features and applications of the iPhone. *Id.* Prior to September 13, 2013—the day that Apple released the "iOS 7" operating system, which is discussed further below— iPhones operated on the "iOS 6" operating system or an earlier iOS operating system. *See, e.g.*, ¶ 9–10.

The iPhone 4 was the first iPhone device to offer a feature known as "FaceTime." *Id.* ¶ 37. FaceTime is a video conferencing feature that allows iPhone users to communicate via video calls, as opposed to traditional audio calls. *Id.* Apple's press releases about the iPhone 4 described the iPhone 4 as "the new iPhone 4 featuring FaceTime." *Id.* In addition, FaceTime was featured prominently in Apple's advertising campaign for the iPhone 4. *Id.* ¶ 38. "[S]everal of Apple's television advertisements for the iPhone 4 focused exclusively on FaceTime" and FaceTime's ability to "bridge the gap between friends and loved ones no matter the geographic distance between them." *Id.* For example, an iPhone 4 advertisement depicted a deployed solider using FaceTime to view his pregnant wife's sonogram appointment, and a hearing-impaired couple communicating over FaceTime in sign language. *Id.* ¶¶ 39–40.

Prior to November 2012, iPhone 4 and iPhone 4S devices used two methods to connect a FaceTime call: (1) the peer-to-peer method, and (2) the relay method. *Id.* ¶ 52. "[T]he two connection methods would occur in parallel, and the call would be connected through whichever method achieved a connection first." *Id.* ¶ 55. The call would connect through the peer-to-peer method approximately 90 to 95% of the time. *Id.* Through the peer-to-peer method, the caller and callee exchanged data directly between each other over the internet. *Id.* ¶ 53.

"[S]ometimes, however, it was not possible to connect a FaceTime call through the peer-

to-peer method," and thus the FaceTime call would instead connect through the relay method. *Id.* ¶ 54. Through the relay method, the caller and the callee connected to a relay server that relayed the data on behalf of the devices. *Id.* ¶ 5. Apple used servers from a company called Akamai Technologies, Inc. ("Akamai"), to relay FaceTime calls through the relay method. *Id.* Akamai charged Apple fees based on the amount of FaceTime calls that connected through Akamai's servers. *Id.* ¶¶ 5, 59. Accordingly, if a low number of FaceTime calls connected through the relay method, Apple paid Akamai a lower fee than if a higher number of FaceTime calls connected through the relay method. *Id.*

### a. Patent Infringement Trial and Apple's Transition to Only the Relay Method

On November 7, 2012, a jury found that Apple's use of the peer-to-peer method to connect FaceTime calls infringed patents owned by VirnetX, Inc. ("VirnetX"). *Id.* ¶ 61. Indeed, due to the willful nature of Apple's infringement, the jury ordered Apple to pay an ongoing royalty to VirnetX that was higher than the effective royalty for use of VirnetX's patents. *Id.*

In order to avoid paying royalty fees to VirnetX for use of VirnetX's patents, Apple eliminated the peer-to-peer method for FaceTime calls. *Id.* ¶ 61. Thus, all FaceTime calls on devices using iOS 6 or earlier operating systems connected via the relay method 100% of the time. *Id.* However, Apple's shift to the relay only method meant that Apple's fees to use Akamai's relay servers increased substantially. *Id.* ¶ 62. According to the FAC, internal Apple emails show that Apple's switch to the relay only method for FaceTime calls caused Apple's fees to Akamai to increase substantially. *Id.*

### b. Introduction of iOS 7

As a result of Apple's mounting relay fees, Apple began to explore options for decreasing relay usage for FaceTime calls. *Id.* ¶ 65. On September 13, 2013, Apple released a new operating system, iOS 7. *Id.* ¶ 67. Unlike iOS 6 and earlier operating systems, iOS 7 allowed users to connect a FaceTime call using a peer-to-peer method that had not yet been found to infringe VirnetX's patents. *Id.* ¶ 68. Thus, the introduction of iOS 7 provided Apple with a way to avoid

3

the millions of dollars in increased relay fees that Apple was paying to Akamai. *Id.*

Problematically, however, the introduction of iOS 7 only reduced relay usage to the extent that iPhone users who were operating iOS 6 or earlier operating systems voluntarily transitioned to iOS 7. *Id.* ¶ 68. The upgrade to iOS 7 was free of cost. Nonetheless, iPhone 4 and iPhone 4S users were reluctant to switch to iOS 7. Specifically, "iOS7 was a more robust and powerful operating system that acted as a significant drain on the processing capability of any device on which it ran." *Id.* ¶ 71. Although *new* iPhone devices, such as the iPhone 5 and iPhone 5C, "were designed to include a more powerful processor in order to function properly with iOS7," the iPhone 4 and iPhone 4S devices were not designed with processors that could handle the upgrade to iOS 7. *Id.* ¶¶ 71–72.

According to the FAC, "transitioning to iOS7 on an iPhone 4 or iPhone 4S significantly impaired" the device's functionality. *Id.* ¶ 72. For example, iPhone 4 and iPhone 4S devices that transitioned to iOS 7 experienced problems such as "non-responsiveness, keyboard sluggishness, extremely slow app[lication] launching and device crashes." *Id.* ¶ 72. Plaintiffs also allege that "[f]or a sizeable portion of the iPhone 4 and 4S population, a defect in iOS7 meant that transitioning to iOS7 would prevent [iPhone 4 and iPhone 4S users] from accessing Wi-Fi and/or Bluetooth," which are two critical features of the iPhone. *Id.* ¶¶ 80–86. Moreover, "Apple made it impossible for users who had transitioned to iOS7 to revert back to an earlier version of iOS," even though Apple previously allowed users to install older operating systems, *Id.* ¶ 80. Thus, if an iPhone 4 or iPhone 4S user transitioned to iOS 7 and experienced lost functionality, the user could not transition back to iOS 6 or an earlier operating system. *Id.*

### c. Apple's Disabling of FaceTime for iOS 6 and Earlier Operating Systems

Because of the functionality problems discussed above, "a sizeable percentage of Apple's user base" continued to use iOS 6 or an earlier operating system after the introduction of iOS 7. *Id.* ¶ 88. Plaintiffs allege that this was problematic for Apple because, as set forth above, iPhone 4 and iPhone 4S devices that used iOS 6 or earlier operating systems connected on FaceTime through

4

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

the relay method, rather than the new peer-to-peer method used on iOS 7. *Id.* ¶ 89. Thus, Apple continued to pay Akamai substantial fees. *Id.*

According to the FAC, Apple decided to "break" FaceTime for iOS 6 and earlier operating systems. *Id.* ¶ 90. Specifically, Apple "cause[d] a digital certificate necessary to the operation of FaceTime on iOS 6 and earlier operating systems to prematurely expire" on April 16, 2014. *Id.* ¶ 91. As a result, FaceTime stopped working on iPhone 4 and iPhone 4S devices that used iOS 6 or earlier operating systems. *Id.* The Court will hereafter refer to this event as the "FaceTime Break."

In order to regain usage of FaceTime, iPhone 4 and iPhone 4S users were required to upgrade to iOS 7, which utilized the new peer-to-peer method to connect FaceTime calls. *Id.* However, as set forth above, transitioning to iOS 7 on an iPhone 4 or an iPhone 4S caused the device to "buckle under the weight of the new software." *Id.* ¶ 12.

Thus, Plaintiffs allege that after Apple disabled FaceTime for iOS 6 and earlier operating systems on April 16, 2014, Apple in effect gave iPhone 4 and iPhone 4S users three options. The iPhone 4 or 4S user could either: (1) continue to use iOS 6 or an earlier operating system, but never regain the ability to use FaceTime; (2) upgrade to iOS 7, but suffer the lost functionality that iOS 7 caused iPhone 4 and iPhone 4S devices; (3) purchase a new iPhone device, such as an iPhone 5 or 5C, that had the processing capability to successfully operate using iOS 7, and thus regain the ability to use FaceTime on iOS 7. *See id.*

The FAC alleges that, at the time that Apple decided to disable FaceTime for users of iOS 6 and earlier operating systems, Apple knew that "[a]ll users with [iOS] 6.0 and older c[ould not] make FaceTime [calls] any longer" as a result of Apple's conduct. *Id.* ¶ 98. Further, Apple "fully recognized that FaceTime was a very important tool" for iPhone 4 and 4S owners "that allowed loved ones separated by geographic distance to remain connected in a meaningful way." *Id.* ¶ 95. Nonetheless, Apple broke FaceTime in order to gain a financial advantage and reduce relay fees. *Id.* Indeed, some Apple employees seem to have found the FaceTime Break quite funny—one employee wrote "hilarity ensues" to describe the aftermath. Mot. at 9. At least some senior Apple

5

executives were aware of what was occurring and issued a directive to falsely blame the FaceTime Break on a "bug". Mot at 11; *see* FAC ¶ 108.

### d. Named Plaintiffs' Experiences

Plaintiff Christina Grace ("Grace") is a California resident who purchased an iPhone 4 in August 2010. ECF No. 199-2 at 83:15–84:3; FAC ¶ 23. Grace testified that she used FaceTime. ECF No. 225-11 (excerpts of Grace's deposition testimony). A review of Grace's iPhone 4 revealed at least one FaceTime use and a number of entries that may or may not have been FaceTime uses. ECF No. 223-4 at 1.

Plaintiff Ken Potter ("Potter") is also a California resident. *Id.* ¶ 25. Potter purchased a 32 gigabyte ("GB") iPhone 4 in September 2010, and a 16 GB iPhone 4 in March 2011. ECF No. 199-3 at 50:14–51:23. In early 2011, Potter "jailbroke" his 32 GB iPhone 4. *Id.* at 222:5–22. Potter did not jailbreak his 16 GB iPhone 4. *Id.* at 223:24–224:5. Potter upgraded his non-jailbroken phone to iOS 7.1.1, on June 25, 2014, and regained the ability to use FaceTime on the device at that time. *Id.* at 152:17–22.

### B. Procedural History

On February 2, 2017, Grace filed a putative class action complaint in this Court against Apple. ECF No. 1. Plaintiff sought to represent a class consisting of "All owners of Apple iPhone 4 or Apple iPhone 4S devices in the United States who on April 16, 2014, had the iOS6 or earlier operating system on their iPhone 4 or iPhone 4S." *Id.* ¶ 107. The complaint alleged causes of action against Apple for (1) trespass to chattels, and (2) violations of the UCL, each based on Apple's intentional disabling of FaceTime on iOS 6 and earlier operating systems. *See id.* ¶ 1.

On March 22, 2017, Apple moved to dismiss the complaint. ECF No. 33. According to Apple, Grace lacked standing under Article III and the UCL because Grace had no right to uninterrupted FaceTime service under the terms of Apple's Software License Agreement. *Id.* at 13–17. Further, Apple argued that Grace lacked standing to bring claims based on the use of iPhone 4S, which Grace did not own, and that Grace lacked standing to raise issues relating to the

upgrade to iOS 7, which Grace never alleged that she downloaded. *Id.* at 18. In addition, Apple argued that Grace failed to state a claim for trespass to chattels or violations of the UCL. *See, e.g.*, *id.*

Rather than oppose Apple's motion to dismiss, Grace filed the FAC on April 5, 2017. ECF No. 36. The FAC added Potter as a named Plaintiff. Potter alleged that he upgraded to iOS 7 on one of his iPhone 4 devices, and that Potter experienced lost functionality as a result of his upgrade. *Id.*

Grace's amendment of the complaint on April 5, 2017 was an amendment as of right under Federal Rule of Civil Procedure 15(a)(1)(B) because Grace amended the complaint within 21 days of Apple's motion to dismiss the original complaint. *See* Fed. R. Civ. P. 15(a)(1)(B). Accordingly, on April 6, 2017, the Court denied as moot Apple's motion to dismiss the original complaint. *See* ECF No. 37.

On April 19, 2017, Apple filed a motion to dismiss the FAC, which largely raised the same arguments that Apple raised in its motion to dismiss the original complaint. ECF No. 38.[1] On May 3, 2017, Plaintiffs filed an opposition to Apple's motion to dismiss. ECF No. 47. On May 10, 2017, Apple filed a reply. ECF No. 50.

On July 28, 2017, the Court denied Apple's motion to dismiss. *Grace v. Apple Inc.*, 2017 WL 3232464 (N.D. Cal. July 28, 2017). The Court found that Plaintiffs possessed Article III standing, that Plaintiffs had stated claims for violation of the UCL's "unfair" prong and trespass to chattels, and that Plaintiffs had adequately alleged entitlement to restitution and injunctive relief.

On May 4, 2018, Plaintiffs filed a motion for class certification. ECF No. 174 ("Mot."). Plaintiffs seek to certify the following nationwide class under Rule 23(b)(2) and Rule 23(b)(3). This class is defined as the following:

All owners of Apple iPhone 4 or Apple iPhone 4S devices in the United States who

---

[1] Apple also requested that the Court take judicial notice of Apple's iOS 6 and iOS 7 License Agreements. ECF No. 39. The Court granted this request. *Grace v. Apple Inc.*, 2017 WL 3232464, at *4 n.1 (N.D. Cal. July 28, 2017)

7

United States District Court
Northern District of California

on April 16, 2014, had iOS 6 or earlier operating systems on their iPhone 4 or iPhone 4S devices.

Mot. at vii. In the alternative, Plaintiffs seek to certify a California class under Rule 23(b)(2) and Rule 23(b)(3). This class is defined as the following:

All owners of Apple iPhone 4 or Apple iPhone 4S devices in California who on April 16, 2014, had iOS 6 or earlier operating systems on their iPhone 4 or iPhone 4S devices.

*Id.* On June 15, 2018, Apple filed its opposition. ECF No. 201 ("Opp."). On July 13, 2018, Plaintiffs filed their reply. ECF No. 225 ("Reply").

On July 19, 2018, Plaintiffs filed a motion to strike the Declaration of Dr. Avi Rubin, Apple's technical expert. ECF No. 233. On August 2, 2018, Apple filed its opposition. ECF No. 242. On August 9, 2018, Plaintiffs filed their reply. ECF No. 246.

On July 20, 2018, Apple filed objections to evidence submitted in connection with Plaintiffs' reply. ECF No. 235.

## II.    LEGAL STANDARD

Class actions are governed by Rule 23 of the Federal Rules of Civil Procedure. Rule 23 does not set forth a mere pleading standard. To obtain class certification, plaintiffs bear the burden of showing that they have met each of the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186, *amended by* 273 F.3d 1266 (9th Cir. 2001). "A party seeking class certification must affirmatively demonstrate … compliance with the Rule[.]" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Rule 23(a) provides that a district court may certify a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). That is, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy of representation to maintain a class action. *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012).

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

United States District Court
Northern District of California

If all four prerequisites of Rule 23(a) are satisfied, the Court must also find that the plaintiff "satisf[ies] through evidentiary proof" at least one of the three subsections of Rule 23(b). *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The Court can certify a Rule 23(b)(1) class when plaintiffs make a showing that there would be a risk of substantial prejudice or inconsistent adjudications if there were separate adjudications. Fed. R. Civ. P. 23(b)(1). The Court can certify a Rule 23(b)(2) class if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, the Court can certify a Rule 23(b)(3) class if the Court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim[.]'" *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (quoting *Dukes*, 564 U.S. at 351); *see also Mazza*, 666 F.3d at 588 ("'Before certifying a class, the trial court must conduct a 'rigorous analysis' to determine whether the party seeking certification has met the prerequisites of Rule 23.'" (quoting *Zinser*, 253 F.3d at 1186)). This "rigorous" analysis applies to both Rule 23(a) and Rule 23(b). *Comcast*, 569 U.S. at 34 (stating that Congress included "addition[al] ... procedural safeguards for (b)(3) class members beyond those provided for (b)(1) or (b)(2) class members (e.g., an opportunity to opt out)" and that a court has a "duty to take a 'close look' at whether common questions predominate over individual ones").

Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 568 U.S. at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* If a court concludes that the moving party has

met its burden of proof, then the court has broad discretion to certify the class. *Zinser*, 253 F.3d at 1186.

## III.    DISCUSSION

Apple opposes Plaintiffs' motion for class certification on four main grounds. First, Apple argues that Plaintiffs cannot demonstrate Rule 23(a)(3) typicality because the proposed class representatives' iPhone usage is not typical of the class. Second, Apple advances a series of challenges to Rule 23(b)(3) predominance. Specifically, Apple argues that Plaintiffs' trespass to chattels claim and Plaintiffs' UCL claims require individualized inquiries, that Plaintiffs' damages theory does not satisfy *Comcast*, and that Plaintiffs' proposed nationwide class is barred under California's choice of law test. Third, Apple briefly argues that Plaintiffs cannot demonstrate Rule 23(b)(3) superiority. Fourth, Apple argues that no Rule 23(b)(2) injunctive class can be certified. For their part, Plaintiffs contest Apple's challenges to class certification arguments and have filed a separate motion to strike the report of Dr. Avi Rubin, Apple's technical expert. Apple has also filed an objection to evidence Plaintiffs have submitted in connection with their reply.

The Court rejects Apple's Rule 23(a)(3) typicality argument. The Court also rejects most of Apple's Rule 23(b)(3) arguments. In particular, the Court finds that individual inquiries are not necessary for Plaintiffs' trespass to chattels claim and Plaintiffs' UCL claim, and the Court rejects Apple's *Comcast* challenge to Plaintiffs' damages model. However, the Court agrees with Apple that California's choice of law test precludes certification of a nationwide class, and agrees further that no Rule 23(b)(2) class is warranted. Finally, the Court closes by denying Plaintiffs' motion to strike the report of Apple's expert and rejecting Apple's evidentiary objections.

### A.    Rule 23(a) Analysis

"Parties seeking class certification must satisfy each of the four requirements of Rule 23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)." *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017), *cert. denied sub nom. ConAgra Brands, Inc. v. Briseno*, 138 S. Ct. 313 (Oct. 10, 2017). The Court takes each

of Rule 23(a)'s requirements in turn, and finds that Plaintiffs have satisfied all four.

### 1. Numerosity

Under Rule 23(a)(1), Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "In determining whether numerosity is satisfied, the Court may consider reasonable inferences drawn from the facts before it." *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 589–90 (N.D. Cal. 2015).

Apple concedes that there are at least 16 million class members spread across the country, and does not dispute that numerosity would be satisfied if the Court certified a California-only class. ECF No. 174-75 at 5:18–24. Consequently, because the proposed class "numbers well over forty and joinder would be impracticable, the Court finds that the numerosity requirement is satisfied." *In re Yahoo Mail*, 308 F.R.D. at 590; *see, e.g.*, *Rannis v. Recchia*, 380 F. App'x 646, 651 (9th Cir. 2010) ("In general, courts find the numerosity requirement satisfied when a class includes at least 40 members."); *Huynh v. Harasz*, 2015 WL 7015567, at *5 (N.D. Cal. Nov. 12, 2015) ("As other district courts have noted, 'the numerosity requirement is usually satisfied where the class comprises 40 or more members.'" (quoting *Twegbe v. Pharma Integrative Pharmacy, Inc.*, 2013 WL 3802807, at *3 (N.D. Cal. July 17, 2013)).

### 2. Commonality

Next, Rule 23(a)(2) states that "[o]ne or more members of a class may sue or be sued as representative parties on behalf of all members only if … there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, Plaintiffs must show that the class members have suffered "the same injury," meaning that class members' claims must "depend upon a common contention" of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Dukes*, 564 U.S. at 350 (quotation marks and citation omitted). Plaintiffs must demonstrate not merely the existence of a common question, but rather "the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation." *Id.* (quotation marks omitted)

11

(emphasis in original). Nevertheless, the "common contention need not be one that will be answered, on the merits, in favor of the class." *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015) (internal quotation marks omitted). Additionally, "for purposes of Rule 23(a)(2), even a single common question will do." *Dukes*, 564 U.S. at 359 (alteration and quotation marks omitted); *see also Mazza*, 666 F.3d at 589 ("[C]ommonality only requires a single significant question of law or fact.").

Plaintiffs identify a number of issues common to the class: (1) whether Apple deliberately caused the FaceTime Break; (2) whether Apple intentionally interfered with Plaintiffs' devices; (3) whether Apple concealed its conduct; and (4) whether iOS 7 impaired the functionality of iPhone 4 and iPhone 4S devices. Apple does not dispute that these are common questions capable of satisfying Rule 23(a)(2). In fact, Apple does not dispute Rule 23(a)(2) commonality at all. The Court therefore finds that Plaintiffs have satisfied Rule 23(a)(2)'s commonality requirement.

### 3. Typicality

Rule 23(a)(3) requires plaintiffs to show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010) (quoting *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001)). This requirement is "permissive and requires only that the representative's claims are reasonably co-extensive with those of the absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998). Claims that are reasonably co-extensive with the claims of absent class members will satisfy the typicality requirement, but the class must be limited to "those fairly encompassed by the named plaintiff's claims." *Dukes*, 564 U.S. at 349. "[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (citations omitted). "The purpose

of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Id.*

Apple presents three arguments as to why Plaintiffs' two proposed class representatives cannot satisfy Rule 23(a)(3) typicality. First, Apple argues that Grace is not typical because she never used FaceTime or did not use FaceTime enough. Second, Apple argues that Potter is not typical because any interruption in FaceTime access was too brief to have injured him. Third, Apple argues that Potter is not typical because he chose to "jailbreak" his iPhone. The Court disagrees with Apple's first two arguments and agrees partially with Apple's third argument.

First, Apple's opposition, which was based on the neutral evaluator's initial findings, argues that Grace is not typical because "[a] review of her phone demonstrates the absence of ***any*** FaceTime calls made on her iPhone 4." Opp. at 7. However, Apple has since conceded that this argument was ultimately determined to be empirically incorrect. ECF No. 223-4 at 1 (Apple acknowledging this). Consequently, Apple's new argument is that Grace is not typical because she did not use FaceTime enough. The Court disagrees. Plaintiffs' theory of the case is that Apple is liable because the FaceTime Break reduced the monetary value of class members' iPhones. Determining precisely how often a class member like Grace used FaceTime is irrelevant to that analysis. The Court therefore finds that Grace's claims are typical of the class she seeks to represent.

Second, Apple argues that Potter is not typical because he was only fleetingly deprived of FaceTime access. That matters, Apple says, because a California trespass to chattels claim requires that a plaintiff be deprived of personal property for a substantial time, a "mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession." *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1357 (2003). This is unpersuasive. The FaceTime Break occurred on April 16, 2014, and Apple's expert states that Potter upgraded his 16 GB iPhone 4 to iOS 7 on June 25, 2014. ECF No. 223-6, Second Declaration of Avi Rubin ("Second Rubin Decl.") at 24. Apple is therefore arguing that 71 days without FaceTime is "a mere momentary or theoretical

United States District Court
Northern District of California

deprivation." It is not, a point underscored by Apple's failure to point to any case adopting its view.

Apple's argument is also irrelevant. California recognizes three ways to establish an injury in the context of a trespass to a computer system or similar device. Specifically, injury exists where "the purported trespass: (1) caused physical damage to the personal property, (2) impaired the condition, quality, or value of the personal property, or (3) deprived plaintiff of the use of personal property for a substantial time." *Fields v. Wise Media, LLC*, 2013 WL 5340490, at *4 (N.D. Cal. Sept. 24, 2013). Apple's argument about deprivation length is only relevant if Plaintiffs base their injury on a deprivation theory of harm. However, Plaintiffs are instead proceeding under an impaired value theory, which means that Apple's argument is beside the point. The Court explores this issue further in the subsequent Rule 23(b)(3) predominance analysis.

Third, Apple argues that Potter is not typical because he chose to "jailbreak" his 32 GB iPhone 4. Broadly speaking, to "jailbreak" an iPhone is to remove programmed limitations in order to enlarge the iPhone's functionality, run unauthorized applications, or otherwise change the iPhone's performance. *United States v. Flores-Lopez*, 670 F.3d 803, 808 (7th Cir. 2012) (discussing this); *United States v. Lee*, 2012 WL 2031220, at *2 (D. Haw. June 6, 2012), *aff'd*, 585 F. App'x 632 (9th Cir. 2014) (same). Apple argues that Potter's jailbreaking of his 32 GB iPhone 4 means he is subject to unique defenses (*e.g.* violation of the iOS Software License) and may not even have suffered a cognizable injury.

The Court agrees that Potter's claims based on his jailbroken 32 GB iPhone 4 are not typical of the class. Only a small fraction of iPhone owners jailbreak their devices and one of the main reasons to jailbreak an iPhone is to alter its performance and functionality relative to a normal iPhone, *i.e.* to make it significantly different. Opp. at 8 (describing jailbreaking and its effect on iPhones); Reply at 3 (stating less than 5 percent of iPhones are jailbroken). Accordingly, claims based on Potter's jailbroken 32 GB iPhone 4 would be subject to unique defenses, such as that Potter violated the terms of Apple's iOS Software License and that any performance issues

with Potter's 32 GB iPhone 4 are attributable to the device being jailbroken rather than the FaceTime Break. Opp. at 9.[2]

As a result, the Court will exercise its "broad discretion to modify class definitions" and amend Plaintiffs' proposed nationwide and California class definitions to exclude jailbroken iPhones. *Williams v. City of Antioch*, 2010 WL 3632199, at *3 (N.D. Cal. Sept. 2, 2010) (quoting *Powers v. Hamilton County Public Defender Com'n*, 501 F.3d 592, 619 (6th Cir. 2007)); *Charlebois v. Angels Baseball, LP*, 2011 WL 2610122, at *3 (C.D. Cal. June 30, 2011) ("[T]he Court is free to limit the class definition or give Plaintiffs leave to do so."); 7A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1759 (3d ed.) ("[T]he court may construe the complaint or redefine the class to bring it within the scope of Rule 23 or it may allow plaintiff to amend in order to limit the class.").

Nevertheless, Potter still satisfies typicality. Potter owned a *non*-jailbroken 16 GB iPhone 4 in addition to his jailbroken 32 GB iPhone 4. ECF No. 199-3 at 50:14–51:23. Potter's claims based on the 16 GB iPhone 4 are not subject to any jailbreaking-related differences or defenses because the 16 GB iPhone 4 was not jailbroken. Thus, even though Potter's claims based on his 32 GB iPhone 4 do not satisfy Rule 23(a)(3) typicality, Potter's 16 GB iPhone 4 does. Reply at 3 (noting Apple's jailbreaking typicality challenges apply only to Potter's 32 GB iPhone 4).

In sum, the Court finds that Grace and Potter, as to his 16 GB iPhone 4 only, satisfy Rule 23(a)(3) typicality. The Court also amends Plaintiffs' proposed nationwide and California class definitions to exclude jailbroken iPhones.

**4. Adequacy**

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the

---

[2] The existence of jailbroken iPhones does not, however, bar certification for ascertainability reasons because the Ninth Circuit has clarified that there is no freestanding ascertainability requirement under Rule 23(a). *Briseno*, 844 F.3d at 1133 ("We therefore join the Sixth, Seventh, and Eighth Circuits in declining to adopt an administrative feasibility requirement."); *see Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (noting "ascertainability" is synonymous with "administrative feasibility").

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

interests of the class." Fed. R. Civ. P. 23(a)(4). In the Ninth Circuit, to test the adequacy of a class representative, a court must answer two questions: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members; and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003) (citing *Hanlon*, 150 F.3d at 1020).

Apple does not dispute the adequacy of Plaintiffs' counsel or the prospective lead plaintiffs. The Court finds that Plaintiffs' counsel satisfies Rule 23(a)(4) adequacy. Specifically, the Court finds that Plaintiffs' counsel has experience in class action suits, has no conflicts of interest in this case, has vigorously litigated this case, and will continue to do so. *See* ECF No. 174-77 (listing attorneys' background and experience). The Court also finds that prospective lead plaintiffs Grace and Potter satisfy Rule 23(a)(4) adequacy. Specifically, the Court finds that Grace and Potter do not have conflicts of interest with other class members, that they are willing and able to serve as class representatives, and that they will vigorously pursue this suit. *See* ECF No. 174-80, Declaration of Christina Grace; ECF No. 174-81, Declaration of Ken Potter.

In sum, the Court finds that Plaintiffs have satisfied the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy. The Court now turns to whether Plaintiffs have satisfied Rule 23(b)(3)'s predominance requirement.

**B. Rule 23(b)(3) Predominance**

Under Rule 23(b)(3), plaintiffs must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) predominance requirement is "even more demanding" than Rule 23(a)'s commonality counterpart. *Comcast*, 569 U.S. at 34. Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623 (citation omitted). The Ninth Circuit has held that "there is clear justification for handling the dispute on a representative rather than an individual basis" if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single

United States District Court
Northern District of California

adjudication." *Hanlon*, 150 F.3d at 1022. As the U.S. Supreme Court recently explained, "[t]he predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quoting 2 William Rubenstein, Newberg on Class Actions, § 4:49 at 196–97 (5th ed. 2012)). "When 'one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.'" *Id.* (quoting 7AAC Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1778 at 123–24 (3d ed. 2005)).

Plaintiffs argue that common questions predominate because this case stems from Apple's uniform and simultaneous creation of the FaceTime Break, which affected all class members at the same time and in the same way. *Newton v. Am. Debt Servs., Inc.*, 2015 WL 3614197, at *10 (N.D. Cal. June 9, 2015) ("[W]here a plaintiff's claim under the 'unfair' prong 'hinges on the existence of a uniform business practice or series of practices amenable to some degree of precise definition,' certification of a Rule 23(b)(3) class may be warranted." (quoting *Herskowitz v. Apple, Inc.*, 301 F.R.D. 460, 476 (N.D. Cal. 2014)). Plaintiffs note further that common questions are especially likely to predominate because this case centers almost exclusively on Apple's conduct, namely causing the FaceTime Break, as opposed to class members' individual experiences. *See In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *17–18 (N.D. Cal. Oct. 27, 2016) (finding Lenovo's decision to install VirtualDiscovery on class members' laptops was subject to common proof). In line with this view, Plaintiffs' damages model bases class members' damages on the diminution in the resale market value of affected iPhone 4 and iPhone 4S devices, which eliminates the need to base damages on class members' personal experiences with the FaceTime Break (*e.g.* length of time without FaceTime access).

Apple has four responses. First, Apple argues that Plaintiffs' trespass to chattels claim

requires individual inquiries into whether class members have suffered legally cognizable harm. Second, Apple argues that the same is true for Plaintiffs' UCL claim. Third, Apple argues that Plaintiffs' classwide damages theory does not align with Plaintiffs' theory of liability. Fourth, Apple argues that California's choice of law analysis bars applying California law to a nationwide class, and that applying the laws of each individual state would defeat predominance. The Court rejects Apple's first three arguments, but agrees with Apple that California's choice of law test precludes certification of a nationwide class.

### 1. Trespass to Chattels

The California Supreme Court has explained that "while a harmless use or touching of personal property may be a technical trespass (see Rest. 2d of Torts, § 217), an interference (not amounting to dispossession) is not actionable under modern California and broader American law without a showing of harm." *Hamidi*, 30 Cal. 4th at 1350–51. Specifically, in the context of trespass to a computer system or other similar devices, injury is adequately alleged where the plaintiff pleads "that the purported trespass: (1) caused physical damage to the personal property, (2) impaired the condition, quality, or value of the personal property, or (3) deprived plaintiff of the use of personal property for a substantial time." *Fields*, 2013 WL 5340490, at *4.

Apple argues that individual inquiries will be necessary in order to determine whether the FaceTime Break deprived class members of the use of FaceTime for a "substantial time." Apple says this is so because an actionable deprivation "must be for a time so substantial that it is possible to estimate the loss caused thereby. A mere momentary or theoretical deprivation of use is not sufficient unless there is a dispossession." *Hamidi*, 30 Cal. 4th at 1357 (quoting Restatement (Second) of Torts § 217 cmt. i). In other words, Apple argues that class members pursuing a trespass to chattels claim based on a deprivation theory can only recover if class members were deprived of FaceTime use for a substantial time as opposed to a momentary or theoretical deprivation.

Apple's argument misconstrues Plaintiffs' theory of liability. Plaintiffs are not arguing that

18

Apple's trespass deprived them "of the use of personal property for a substantial time" but rather proceed under the alternative theory that the FaceTime Break "impaired the condition, quality, or value" of their iPhones. Indeed, Plaintiffs' briefing makes this point clear. *See, e.g.,* Mot. at 1 ("The inability to use the FaceTime feature impacted the function and value of all Class members' devices."); *id.* at 22 ("Dr. Hastings has constructed an econometric damages model which shows that the FaceTime Break caused all Class members' iPhone 4 and 4S devices to lose value."); Reply at 4 ("Again, Plaintiffs' trespass to chattels claim is premised on the impairment to the *value* of all iPhone 4 and 4S devices affected by the FaceTime Break."). So does the report of Plaintiffs' damages expert, Professor Justine Hastings. ECF No. 173-6, Expert Report of Justine S. Hastings, Ph.D. ("Hastings Report") at 21 ("Here, the harmful event was the [FaceTime] Break. The harm is the diminished value of the phone as measured by resale market prices."). Apple's argument that individual inquiries will be necessary to determine whether Plaintiffs were deprived of their property for a "substantial time" is therefore irrelevant—answering that question is unnecessary in this case.

### 2. UCL

California's Unfair Competition Law ("UCL") prohibits unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200. The UCL creates a cause of action for business practices that are (1) unlawful, (2) unfair, or (3) fraudulent. Each "prong" of the UCL provides a separate and distinct theory of liability. *Lozano v. AT & T Wireless Servs., Inc.*, 504 F.3d 718, 731 (9th Cir. 2007). Plaintiffs proceed under the unfair prong of the UCL. Compl. ¶¶ 130–35. Although there are a number of ways to satisfy the unfairness prong, Plaintiffs here rely on the balancing test. *Grace*, 2017 WL 3232464, at *14 (discussing different tests used to satisfy unfairness prong and finding Plaintiffs proceeded under the balancing test). The "balancing test" "asks whether the alleged business practice is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers and requires the court to weigh the utility of the defendant's

conduct against the gravity of the harm to the alleged victim.' " *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1115 (N.D. Cal. 2015) (quoting *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 257 (2010)).

Apple argues that the balancing test precludes class certification because a class member's harm will depend on a number of individual inquiries such as when the class member upgraded to iOS 7, and whether the class members suffered any performance-related issues as a result. Apple therefore analogizes this case to the denial of class certification in *Herskowitz*, 301 F.R.D. 460. The *Herskowitz* plaintiffs sought to certify a class of consumers who had been charged multiple times for the same product on one of Apple's online marketplaces. *Id.* at 467.[3] As here, the *Herskowitz* plaintiffs pursued a claim under the UCL's unfair prong. *Id.* at 476. This Court denied certification in part because of a concern that different class members had experienced different harms depending on, *inter alia*, whether or not they had requested a refund. *Id.* The Court reasoned that while it might "be possible to determine harm uniformly for each of these (and other) possible scenarios, determining which scenario applies to any given class member will require individualized inquiries." *Id.*

Apple's *Herskowitz* argument again misapprehends Plaintiffs' theory of liability. Apple assumes that Plaintiffs seek to measure class members' harm by the length of their time without FaceTime or the degree of their iPhone performance problems after upgrading to iOS 7. If that were the case, *Herskowitz*'s concern that individual inquiries would be necessary to determine the type of harm that might apply. However, Plaintiffs have repeatedly stated that they are not attempting to measure harm in this manner.[4] Plaintiffs' theory of the case is that the FaceTime

---

[3] For example, one *Herskowitz* plaintiff bought a song on the iTunes Store, but the song did not appear in her music library. Consequently, the plaintiff bought the song again, at which point the song appeared in her music library. The plaintiff was charged for both purchases. *Herskowitz*, 301 F.R.D. at 466.

[4] Apple also overlooks another distinction between *Herskowitz* and the instant case. In *Herskowitz*, the Court found that "Plaintiffs have failed to provide any evidence to support the existence of a uniform business practice or series of practices respecting refunds in cases of double-billing." *Herskowitz*, 301 F.R.D. at 476. By contrast, the evidence here suggests the FaceTime Break was the result of a single action undertaken by Apple on a specific date which affected every class

20

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

United States District Court
Northern District of California

1    Break made class members' iPhones less valuable by forcing them to choose between (1) keeping

2    iOS 6 and losing FaceTime or (2) upgrading to iOS 7 and keeping FaceTime, but experiencing

3    substantial performance problems.[5] Plaintiffs seek to measure how much this problem diminished

4    the monetary value of class members' iPhones' by comparing Best Buy's resale prices for the

5    iPhone 4 and iPhone 4S before and after the FaceTime Break. This means Plaintiffs can measure

6    class members' harm through the devices' decreased market value instead of a case-by-case

7    determination of when class members upgraded to iOS 7 and what performance issues they

8    experienced thereafter. Best Buy's data is especially useful in this regard because Best Buy

9    upgrades iPhones to the latest iOS prior to resale, meaning there is no concern that the amount

10   paid for resold iPhones could vary depending on whether a given iPhone was or was not upgraded

11   to iOS 7 when it was resold. Opp. at 15 (noting Best Buy upgrades iPhones' iOS prior to resale).

12       In sum, Apple's Rule 23(b)(3) arguments based on Plaintiffs' trespass to chattels and UCL

13   claims fail because they rest on a misapprehension of Plaintiffs' theory of harm. The Court now

14   turns to Apple's challenge to Plaintiffs' damages model.

15       **3.  Damages Model**

16       Although individual damages calculations alone do not make class certification

17   inappropriate under Rule 23(b)(3), *see Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir.

18   2013) ("[T]he amount of damages is invariably an individual question and does not defeat class

19   action treatment."), the U.S. Supreme Court has held that the plaintiff bears the burden of

20   providing a damages model showing that "damages are susceptible of measurement across the

21   entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. The damages model "must

22

23   _____

member in the same way.

24   [5] Both scenarios are grounded in fact. It is undisputed that FaceTime stopped working on iOS 6 on
     April 14, 2014, and Plaintiffs point to credible evidence that iPhone 4 and iPhone 4S devices

25   performed poorly when running on iOS 7 because it overtaxes the devices' older hardware.
     Compl. ¶¶ 75–76 (quoting *ARS Technica* article that examined iPhone 4 and found that

26   "[e]verything is slower in iOS 7 and that delays due to the new operating system "can become a
     significant percentage of the time you spend" ); *Id.* ¶ 72 (noting iPhone 4 and iPhone 4S have

27   approximately half the random access memory of the iPhone 5 and iPhone 5S).

21

28   Case No. 17-CV-00551-LHK
     ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING
     MOTION TO STRIKE

measure only those damages attributable to" the plaintiff's theory of liability. *Id.* If the plaintiff does not offer a plausible damages model that matches her theory of liability, "the problem is not just that the Court will have to look into individual situations to determine the appropriate measure of damages; it is that Plaintiffs have not even told the Court what data it should look for." *In re MyFord Touch Consumer Litig.*, 2016 WL 7734558, at *15 (N.D. Cal. Sept. 14, 2016).

Plaintiffs' damages theory is presented by their expert, Professor Justine Hastings ("Dr. Hastings"). Dr. Hastings states that "[b]ecause the Break stopped FaceTime from working on the iPhone 4 and 4S absent a migration to iOS 7 (and resulting decrease in functionality with migration), these models' resale prices would have dropped due to a loss in value in the market for a valued feature." Hastings Report at 20. Class members' damages are therefore equal to "the resale value of the phone compared to what the resale value would have been but-for the Break." *Id.* at 21. Dr. Hastings plans to isolate the effect of the FaceTime Break on resale value through multivariate regression modeling. *Id.* at 22. In this approach, an economist creates a model that "relates the price of the product in question to demand and supply factors which affect price based on economic principles and facts about the market." *Id.* The model includes a "dummy variable" that "captures the average difference in price during the period the harmful act was in effect, controlling for the influence on price of other demand and supply factors." *Id.*

Dr. Hastings' analysis relies on data from third-party smart phone resellers, in particular data from Best Buy because it "contains millions of individual-level phone transactions with resale prices for the phones and detailed characteristics of each phone, along with the date of the sale." Hastings Report at 24. Best Buy's data also includes "iPhone 4 models through iPhone 6 models, and Samsung Galaxy models S4 through S6." *Id*. Dr. Hastings can therefore use these other models as a "a comparison group for estimating the impact of the Break on iPhone 4 and iPhone 4S resale prices, controlling for other factors impacting demand and supply for various phone models." *Id.* Best Buy's data for each phone includes relevant characteristics such as model, condition, storage size, and color—which are among the primary factors consumers look to when

United States District Court
Northern District of California

deciding how much they are willing to pay for a phone. *Id.* at 22, 24.

Dr. Hastings also plans to control for other variables that affect iPhone supply and consumer demand, such as prevailing economic conditions and seasonal variation (*e.g.* higher demand around the holidays). *See id.* at 22–27 (discussing this); ECF No. 224-6, Reply Report of Justine S. Hastings, Ph.D. ("Hastings Reply Report"), at 13 (noting model can add further controls if necessary), at 21 ("In fact, the multivariate regression in my report controls for 751 factors, all of which are factors that market participants, like Best Buy, state are important demand and/or supply factors impacting the price of phones."). After accounting for outside variables, Dr. Hastings's basis for class members' damages is the effect of the FaceTime Break on the "price of the phone Best Buy received when it sold the phone to a third-party vendor for eventual resale on the used market to estimate damages." *Id.* at 25. Dr. Hastings concludes that, based on Best Buy's data[6], "the Break caused prices of used iPhone 4 and 4S devices to fall by an estimated 12.72%." *Id.* at 28.

It is important to be clear about what data Dr. Hastings employs. Consumers often trade-in used iPhones to carriers like AT&T or retailers like Best Buy, receiving in-store credit or credit towards the purchase of a new smartphone or in-store credit. For example, Best Buy will not offer cash for used smartphones, but will provide consumers with Best Buy gift cards. ECF No. 224-16 at 36 (so noting); *see* ECF No. 200-3, Expert Report of Dana Trexler ("Trexler Report"), at 12 ("[I]n September 2013, Verizon and AT&T offered customers a minimum of $200 trade-in credit for an iPhone 4 or iPhone 4S in 'good and working condition.'").[7] Retailers like Best Buy then resell the used iPhones in bulk to a range of third parties, such as enterprises, other retailers, and operators. Trexler Report at 36. We have, then, two separate but linked markets. Significantly, Dr. Hastings bases her findings off the latter retailer-to-third-party market, instead of the former

---

[6] Dr. Hastings also cross-checked this finding against Amazon data, and found a comparable impact of 17.58 percent. Hastings Report at 26–27.
[7] This is as compared to a more traditional exchange of an iPhone for cash, as would be found on sites like Craigslist or eBay. Trexler Report at 12 (so noting).

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

consumer-to-retailer market. Hastings Report at 25 (noting damages model is based on "the price of the phone Best Buy received when it sold the phone to a third-party vendor" instead of the "trade-in value for phones").

Apple has nine responses to this, none of which are persuasive. First, Apple argues that Dr. Hastings's model is flawed because it measures the diminution in value for *all* iPhone 4 and iPhone 4S devices, even though iPhones that had already upgraded to iOS 7 at the time of the FaceTime Break were not affected. This is unpersuasive. Dr. Hastings's model presumes that the FaceTime Break had a measurable effect on how much the market valued the iPhone 4 and iPhone 4S, and that the reduction in market value can be expressed as a percentage. The fact that she has examined the market as a whole is unproblematic because she is attempting to measure market demand in the aggregate rather than demand for un-upgraded iPhones. *See In re Lidoderm Antitrust Litig.*, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017) ("[T]hat the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of … [Plaintiffs' damages] model."). This is especially true given that damages calculations under the UCL are "particularly forgiving" such that California requires "only that some reasonable basis of computation of damages be used … even if the result reached is an approximation." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017), *cert. granted on other grounds*, 138 S. Ct. 2675 (2018); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("[T]he fact that the amount of [restitution] damage may not be susceptible of exact proof or may be uncertain, contingent or difficult of ascertainment does not bar recovery." (citation omitted)).

Second, Apple argues that Dr. Hastings bases her analysis on the wrong dataset. As noted above, Best Buy provided Dr. Hastings with data indicating how much consumers received when they traded in their used iPhones (the retail market) and with data indicating how much Best Buy received when it resold those used iPhones to other entities (the wholesale market). Apple faults Dr. Hastings for relying on the latter dataset, arguing that her model does not measure "the amount *class members* could have received for their devices" but rather measures only how much Best

United States District Court
Northern District of California

Buy received for reselling used iPhones in bulk to third parties. Opp. at 16. As proof, Apple points to the finding of its damages expert, Dana Trexler, that iPhones' trade-in value increased[8] after the FaceTime Break, which stands in stark contrast to Dr. Hastings's finding that prices on the wholesale market fell. Trexler Report at 44–52.

Plaintiffs respond that relying on trade-in value would be even worse. Plaintiffs note that the headline prices for trading in used iPhones are distorted by rebates and promotions—a point Apple later echoes—and that consumers usually receive credit towards a new smartphone or a store gift card instead of cash. Hastings Reply Report at 18; Reply at 8 n.23; *see* Opp. at 17 (Apple faulting Dr. Hastings's model for failing to "control for promotions and news related to the iPhone 4 and 4S"). Plaintiffs therefore suggest that it is better to rely on wholesale data that can provide a reliable cash-per-iPhone figure than to rely on retail trade-in prices skewed by promotions and rebates, and which pay consumers in hard-to-value gift cards and trade-in credits. *See also Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930, at *5 (C.D. Cal. Dec. 18, 2014) (finding "the numerous complicating factors in the prescription drug market sever the relationship between price and value" such that "a consumer's out-of-pocket cost for a drug is not a proxy for the drug's value to the consumer"). Dr. Hastings even indicates that it would be impossible to construct a damages model based on trade-in value because trade-in value "may include a combination of market value of the phone, discounts, and incentives towards purchases of additional Best Buy products" that "cannot be separated by the economist." Hastings Report at 25; Hastings Reply Report at 18 (stating trade-in price is not a suitable basis for damages modelling "because it often contain[s] discounts and tie-ins to in-store purchases of new products bundled in with the trade-in price, thus preventing the econometrician from being able to separately determine the diminished value of the phone."). More fundamentally, Plaintiffs dispute Apple's assumption that the prices for used iPhones on the retail and wholesale markets are divorced from one another. As Dr.

---

[8] However, the increase in trade-in price was not uniform as Trexler freely admits that some affected iPhones' trade-in value decreased after the FaceTime Break. Trexler Report at 47.

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

Hastings points out, "all major platforms benchmark their phone offers against wholesale market prices." Hastings Reply Report at 19.

Plaintiffs have the better of this argument, though the case is close. *Comcast* holds that damages models "must measure only those damages attributable to" the plaintiff's theory of liability. *Comcast*, 569 U.S. at 35. Plaintiffs' theory of liability is that the FaceTime Break reduced the market value of class members' iPhones, *i.e.* how much class members could expect to receive for their iPhones on the open market. Dr. Hastings concluded that the only feasible way to determine this amount was to look to the prices Best Buy received from bulk sales to third parties in the wholesale market and to use it as a proxy. The Court agrees with Apple that there are flaws with this method, and it is possible that Plaintiffs' model's reliance on an indirect market measure has inflated class members' damages. Nevertheless, the question before the Court is whether Plaintiffs' model "measure[s] only those damages attributable to" the plaintiff's theory of liability. *Comcast*, 569 U.S. at 35. Although "Plaintiffs' model may be flawed, … [Apple] has not established that the model is not tied to plaintiffs' theory of liability." *In re: Lenovo*, 2016 WL 6277245, at *21. Moreover, despite Apple's assertion that the trade-in market is the appropriate basis for a damages measurement, Apple does not explain how Plaintiffs could have accounted for the distorting effects of promotions and rebates. The bottom line is that Apple's arguments about the appropriate dataset raise a factual dispute that goes to the weight of Dr. Hastings's report, not whether her damages model "measure[s] only those damages attributable to" Plaintiffs' theory of liability. *Comcast*, 569 U.S. at 35.

Third, Apple argues that Dr. Hastings has not accounted for the value of the free upgrade to iOS 7. In particular, Apple argues that class members' harm from losing access to FaceTime was minimal because class members could quickly upgrade to iOS 7 at no cost and regain access to FaceTime. This is unpersuasive. Plaintiffs allege that class members' iPhones suffered a significant decrease in performance upon upgrading to iOS 7. FAC ¶¶ 70–87. Thus, Apple's claim that upgrading to iOS 7 redressed all harm fails because it ignores this key aspect of Plaintiffs'

case. Apple's technical expert, Dr. Avi Rubin, appears to suggest that there were not major performance differences between iOS 6 and iOS 7, or that performance issues were attributable to other sources. *See* ECF No. 223-6 at 13–15. Given that Plaintiffs have credible evidence pointing the opposite direction, this is a factual dispute not suited for resolution at the class certification stage. FAC ¶¶ 72–78. Again, Plaintiffs' damages theory is that class members were harmed by the decreased value of their iPhones that resulted from the FaceTime Break. This harm remains constant whether or not class members upgraded. Indeed, the Court rejected a similar version of this argument at the motion to dismiss phase. *See Grace*, 2017 WL 3232464, at *10 ("Apple's argument confuses Plaintiffs' alleged injury. Plaintiffs' alleged injury is that Apple permanently deactivated FaceTime for iOS6, which has caused Plaintiffs' iPhones to diminish in value.").

Fourth, Apple argues that Dr. Hastings's dataset is fatally undermined by the fact that Best Buy upgraded all used iPhone 4 and iPhone 4S phones to iOS 7 prior to resale during the time period Dr. Hastings analyzed. This means all of the iPhones included in Dr. Hastings's analysis were sold with iOS 7. It follows, Apple contends, that none of the devices ever lost the ability to use FaceTime because the FaceTime Break only affected iPhones running iOS 6. Apple argues that this fatally undermines Dr. Hastings's analysis because she cannot create a "benchmark for the value of an iPhone 4 or 4S running FaceTime on iOS 6 before April 16, 2014." Opp. at 16. Apple's theory merely reframes the argument that the Court rejected above. Plaintiffs' theory is that class members were harmed by the FaceTime Break and that this harm is reflected in the price that the market was willing to pay for used iPhone 4 and iPhone 4S devices.[9] Because Plaintiffs have consciously chosen to measure class members' harm through the market value of class members' iPhone 4 and iPhone 4S devices, what matters for benchmark purposes is how much the devices were valued before and after the FaceTime Break instead of what version of iOS the devices were running.

---

[9] Any concern that this market price might not account for the potentially different value of jailbroken iPhones is addressed by excluding jailbroken iPhones from the class definition. *See* Section III.A.3, *supra*.

Fifth, Apple criticizes Dr. Hastings's model for failing to "control for promotions and news related to the iPhone 4 and 4S." Opp. at 17. However, Apple's leading examples are trade-in promotions and Dr. Hastings deliberately relied on wholesale resale value to minimize the distorting effect of trade-in promotions. Hastings Reply Report at 18 (so noting). In other words, Apple faults Dr. Hastings for failing to adequately account for trade-in promotions after Dr. Hastings structured her model to render them irrelevant. That is not a strong argument. Apple's argument is also inconsistent: Apple makes much of Trexler's finding that trade-in values rose after the FaceTime Break, but Trexler's finding is based on averaging trade-in values *without* controlling for other factors such as promotions. *See id.* at 23–24. Thus, Apple faults Dr. Hastings for inadequate controls when its own expert applied even fewer controls to her analysis.

Moreover, the Ninth Circuit has made clear that class certification does not require damages models based on flawless price averages. In *Lambert*, a district court denied certification because the plaintiffs' damages model was based on suggested retail price instead of actual retail price. The Ninth Circuit reversed, and reasoned that a "suggested retail price does not automatically configure an average, but such a precise average is unnecessary for class certification. At this stage, the question is only whether [the plaintiff] … has presented a workable method." *Id.* at 1183–84. Here, Dr. Hastings has proposed a damages model based on actual resale data that controls for a number of external factors. That is enough. Indeed, this Court has previously explained that assertions, like Apple's, that models were flawed owing to their failure to include this or that variable are "prototypical concern[s] that go[] to weight, not admissibility." *In re High-Tech Employee Antitrust Litig.*, 2014 WL 1351040, at *20 (N.D. Cal. Apr. 4, 2014); *see Bazemore v. Friday,* 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").

Sixth, Apple makes the related argument that Dr. Hastings's report is fatally flawed because it fails to control for devices that are "jailbroken, damaged, or ha[ve] undergone unauthorized repair." Opp. at 16. The Court disagrees. Apple's argument applies to at most a small

percentage of the class. For instance, less than 5 percent of iPhone owners jailbreak their devices. Hastings Reply Report at 14–15. Moreover, to the extent that certain class members are entitled to less or no relief because their iPhones fall into these categories, this issue can easily be remedied by the use of claims forms. *See, e.g.*, *In re Korean Ramen Antitrust Litig.*, 2017 WL 235052, at *21 (N.D. Cal. Jan. 19, 2017) ("Post-judgment claims forms and other tools can be used to allow defendants to test an absent class member's purported entitlement to damages and to appropriately apportion damages between class members."); *Nevarez v. Forty Niners Football Co., LLC*, 2018 WL 3830137, at *9–10 (N.D. Cal. July 12, 2018) (finding that class members could certify whether they encountered an actionable violation of a statute and were therefore entitled to damages); *see Lambert*, 870 F.3d at 1183 (noting damages calculations under the UCL are "particularly forgiving" such that California requires "only that some reasonable basis of computation of damages be used … even if the result reached is an approximation."); *id.* at 1882 ("We have repeatedly emphasized that uncertain damages calculations should not defeat certification."); *Pulaski*, 802 F.3d at 988 (noting that California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation."). The Court notes also that, as with Apple's last argument, this type of missing variable argument goes to the weight of Dr. Hastings's analysis rather than its admissibility. *High-Tech*, 2014 WL 1351040, at *20; *Bazemore,* 478 U.S. at 400.

Seventh, Apple alleges that Dr. Hastings "arbitrarily" defined the damages period as extending to December 31, 2016, over 2.5 years after the FaceTime Break. Opp. at 16. The Court disagrees. Dr. Hastings selected a December 31, 2016 end date because the underlying dataset extended to December 31, 2016. Trexler Report at 54. Apple may believe that the FaceTime Break's effects did not last that long, but a bald assertion that it was "arbitrary" for Dr. Hastings to base her analysis on all the data before her is unpersuasive.

Eighth, Apple argues that Dr. Hastings erred in calculating a single average price impact because the iPhone 4 and iPhone 4S are different devices with different attributes. To start, the

Court previously rejected a similar version of this theory at the motion to dismiss phase, when Apple suggested that Grace and Potter lacked standing to bring claims on behalf of iPhone 4S owners because Grace and Potter had purchased the iPhone 4. *See Grace*, 2017 WL 3232464, at *8–9 (rejecting Apple's argument because it was undisputed that both devices used iOS, had FaceTime, and lost FaceTime as a result of the FaceTime Break if they had not upgraded). Yet even if Apple is correct and separate price impacts should be calculated for the iPhone 4 and iPhone 4S, Apple nowhere suggests that Dr. Hastings's model is incapable of doing so. In fact, Plaintiffs indicate that Dr. Hastings's model could be combined with claims forms to determine how much a class member was owed based on a range of iPhone characteristics. Reply at 10 ("[D]uring the claims administration process, the percentage diminution in value may be applied to each class member's device to determine each class member's damages, taking into account the same handful of key characteristics that Apple itself uses to determine the price of a phone (model and condition).").

Ninth, Apple argues that Plaintiffs' damages model does not align with Plaintiffs' UCL claim because the UCL only authorizes restitution. Restitution under the UCL "must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence." *Pulaski*, 802 F.3d at 988 (citation omitted). California law "requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Id.* (citation omitted); *Lambert*, 870 F.3d at 1182 (stating in case including UCL claim that "[w]e have repeatedly emphasized that uncertain damages calculations should not defeat certification."). Plaintiffs' diminution in value damages model meets this bar. On April 16, 2014, the market learned that FaceTime had stopped working on iPhone 4 and iPhone 4S devices that had not upgraded to iOS 7 and that the only way to restore FaceTime was to upgrade. Consequently, comparing the market value of the iPhone 4 and iPhone 4S before and after that information was revealed—*i.e.* before and after the FaceTime Break—seems an accurate way of determining how

Case No. 17-CV-00551-LHK
ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR CLASS CERTIFICATION; DENYING MOTION TO STRIKE

much class members lost as a result of the FaceTime Break.

The cases to which Apple points do not compel a contrary conclusion. *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014); *Philips v. Ford Motor Co.*, 2016 WL 7428810 (N.D. Cal. Dec. 22, 2016), *aff'd*, 726 F. App'x 608 (9th Cir. 2018). In *Brazil*, the plaintiff brought a class action that alleged the defendant had mislabeled its food products. This Court granted certification because the plaintiff's expert presented a damages model that would compare the price of the food products before the misrepresentations and the price of the food products after the misrepresentations. *Brazil*, 2014 WL 5794873, at *5. However, the Court decertified when the model failed to materialize and the alternative model proved inadequate. *Id.* at 6, 14. In brief then, *Brazil* approved a damages model that mirrors the before-and-after Plaintiffs envision here, and the Court decertified only when that model failed to materialize. That is not strong support for finding that Dr. Hastings's model fails to satisfy *Comcast*. Nor is *Philips* any better. The Court there rejected the proposed damages model because the damages model assumed that the true value of the allegedly defective part "was $0." *Philips*, 2016 WL 7428810, at *21. Plaintiffs' damages model does not make that assumption here, so *Philips* is inapposite.

In sum, the Court rejects Apple's challenges to Dr. Phillips's damages model and finds that Plaintiffs' damages model complies with *Comcast*. The Court now turns to Apple's choice of law arguments.

### 4. Choice of Law

Apple argues that "common issues of law do not predominate because California's consumer protection statutes [and trespass to chattels law] may not be applied to a nationwide class with members in … [50] jurisdictions." *Mazza*, 666 F.3d at 589. The Court agrees. California choice of law rules preclude applying California law to the proposed nationwide class. In turn, "[b]ecause adjudication of the nationwide claims will require application of the laws of 50 states, common questions of law would not predominate for the proposed nationwide class, as is required by Rule 23(b)(3)." *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2466559, at *14 (N.D. Cal.

United States District Court
Northern District of California

May 30, 2014). However, the Court notes at the outset that this problem does not prevent certification of Plaintiffs' alternatively proposed California class.

"A federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Zinser*, 253 F.3d at 1187. "Under California's choice of law rules, the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member." *Mazza*, 666 F.3d at 589 (quoting *Wash. Mut. Bank v. Superior Court*, 24 Cal.4th 906, 921 (Cal. 2001)). This showing "is necessary to ensure that application of California law is constitutional." *Id.* at 589–90. "Once the class action proponent makes this showing, the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to class claims.'" *Id.* at 590 (quoting *Wash. Mut. Bank,* 24 Cal.4th at 921).

Apple's principal place of business is in California and it appears Apple's actions that caused the FaceTime Break were taken in California. Moreover, Apple does not dispute that Plaintiffs have sufficiently alleged that California has a constitutionally sufficient aggregation of contacts to the claims of each putative class member in this case. Accordingly, the Court is satisfied that California has sufficient contacts with the class claims. *See In re Yahoo Mail*, 308 F.R.D. at 602 (finding application of California law was constitutionally permissible where defendant's corporate headquarters were in California, the defendant's executive decision makers were largely in California, and the processes at issue were developed and directed in California); *In re Qualcomm Antitrust Litig.*, 292 F. Supp. 3d 948, 978 (N.D. Cal. 2017) (reaching same conclusion on similar facts).

The Court now turns to whether "foreign law, rather than California law, should apply." *Mazza*, 666 F.3d at 590 (citation omitted). California law may be applied on a classwide basis only if "the interests of other states are not found to outweigh California's interest in having its law applied." *Id.* (quoting *Wash. Mut. Bank,* 24 Cal.4th at 921). To determine whether the interests of other states outweigh California's interest, courts administer a three-step government interest test.

32

The court must first determine whether the law of the other states is materially different from California law. *Id.* at 590. Second, if there are differences, the court determines whether the other state has an interest in having its law applied to decide whether a true conflict exists. *Id.* at 591–92. Third, if another state has an interest, the court determines which state's interest would be most impaired if its policy were subordinated to the law of another state. *Id.* at 593.

### a. Material Differences in State Law

Plaintiffs bring a claim for violation of California's Unfair Competition Law ("UCL"), California Business and Professions Code § 17200 *et seq.*, and a claim for trespass to chattels under California law. The Court examines each in turn, and finds that both claims are materially different from the laws of other states.

Apple lists a number of ways in which California's UCL is materially different from other states' consumer protection laws. Plaintiffs do not dispute Apple's argument. Even so, thoroughness compels pointing out at least some of the distinctions. First, pre-filing notice is not required in California, but is a prerequisite in Alabama, Georgia, Indiana, Maine, Massachusetts, Mississippi, Texas, West Virginia, and Wyoming. ECF No. 201-7 at 2–26 (Apple's state law appendix). Plaintiffs did not provide pre-filing notice, so this distinction is material because it is potentially dispositive. *In re Yahoo Mail*, 308 F.R.D. at 602 (noting differences that would spell difference between success and failure of a claim are material). Second, Alabama, Georgia, Louisiana, Mississippi, Montana, South Carolina, and Tennessee prohibit consumer protection class actions outright. *See id.* This too is a potentially dispositive distinction. Fourth, while the UCL does not require scienter, but "many other states' consumer protection statutes do require scienter." *Mazza*, 666 F.3d at 591 (listing examples). Fifth, "California also requires named class plaintiffs to demonstrate reliance, while some other states' consumer protection statutes do not." *Id.* (listing examples). Given this list of distinctions, the Court finds that there are material differences between the UCL claim and other states' consumer protection laws.

The Court now turns to Plaintiffs' trespass to chattels claim. Apple argues that California's

trespass to chattels law materially differs from other states' trespass to chattels laws in three respects. First, Apple argues that California's scienter requirement differs from that of other states. Second, Apple argues that applicable statutes of limitations also vary from state to state. Third, Apple argues that some states do not require a meaningful harm showing. The Court rejects the first two arguments, but agrees with the third.

Apple points to Kentucky, Arizona, Colorado, and New Mexico in support of its argument that California's scienter requirement for trespass to chattel claims differs materially from those of other states. Opp. at 21. Yet according to the cases in Apple's own Appendix, each state's law— like California's—requires that the trespasser have acted intentionally. California law provides that "trespass to chattels lies where an intentional interference with the possession of personal property has proximately caused injury." *Hamidi*, 30 Cal. 4th at 1350–51 (internal quotation marks and citation omitted). Arizona provides that "an intermeddling is not a dispossession unless the actor intends to exercise a dominion and control over [property] inconsistent with a possession in any other person other than himself." *Hagar v. Rodbell*, 2012 WL 827068, at *6 (D. Ariz. Mar. 12, 2012). Kentucky requires an "intent to intermeddle with the particular property … ." *Ingram Trucking, Inc. v. Allen*, 372 S.W. 3d 870, 873 (Ky. Ct. App. 2012). Colorado holds that "it is necessary that the defendant have acted for the purpose of interfering with the chattel." *Mountain States Tel. & Tel. Co. v. Horn Tower Const. Co.*, 363 P.2d 175, 178 (Colo. 1961). Finally, New Mexico provides that "[t]he intention required to make one liable for trespass to a chattel is that he must have acted for the purpose of interfering with the chattel or with knowledge that a disturbance thereof is substantially certain to occur." *Texas-New Mexico Pipeline Co. v. Allstate Const., Inc.*, 369 P.2d 401, 40 (N.M. 1962). In sum, because California, Kentucky, Arizona, Colorado, and New Mexico all require intentional action Apple has failed to show that there is a material difference between California's scienter requirement and those of other states.

Apple next contends that the length of the applicable statute of limitations differs materially from state to state. In particular, although California's statute of limitations for this

claim (like many other states) is three years, Louisiana has a one-year statute of limitations, and the statute of limitations is two years in Alaska, Arizona, Hawaii, Indiana, Kansas, Kentucky, Montana, Oklahoma, Pennsylvania, Texas, and West Virginia. Cal. Civ. Proc. Code § 338; Alaska Stat. § 09.10.070; Ariz. Rev. Stat. Ann. § 12-542; Haw. Rev. Stat. Ann. § 657-7; Ind. Code Ann. § 34-11-2-4; Kan. Stat. Ann. § 60-513; Ky. Rev. Stat. Ann. § 413.125; La. Civ. Code Ann. art. 3492; Mont. Code Ann. § 27-2-207; Okla. Stat. Ann. tit. 12, § 95; 42 Pa. Stat. and Cons. Stat. Ann. § 5524; Tex. Civ. Prac. & Rem. Code Ann. § 16.003; W. Va. Code Ann. § 55-2-12.

It is not clear that these statute of limitations differences matter for this case. The FaceTime Break occurred on April 16, 2014, and this suit was filed approximately 33 months later on February 2, 2017. ECF No. 1. If Plaintiffs' trespass to chattels claim accrued on April 16, 2014, it is likely barred in the 12 states with one or two year statutes of limitations. In that case, the statute of limitations difference would be material because it "spell[s] the difference between the success and failure of a claim." *In re Yahoo Mail*, 308 F.R.D. at 602 (quoting *Mazza*, 666 F.3d at 591). However, Apple does not suggest that these 12 states diverge from the usual rule that claims accrue when a reasonable person would have learned about the facts necessary to file suit. Indeed, even Louisiana applies the "discovery rule" whereby the one year statute of limitations periods begins to run "on the date the injured party discovers or should have discovered the facts upon which his cause of action is based." *Body By Cook v. Ingersoll-Rand Co.*, 39 F. Supp. 3d 827, 836 (E.D. La. 2014). That matters here because Plaintiffs have consistently argued that Apple's conduct came to light only as the result of a 2016 patent trial. ECF No. 1 at 26 ("Apple refused to disclose the truth behind *why* FaceTime had suddenly stopped working … Apple publicly disclosed *nothing* about any of this (until it was reluctantly forced to do so at the VirnetX retrial in 2016)."); FAC at 28 (stating same). Given that the transcripts from that trial were not released until May 9, 2016, Plaintiffs have a reasonable argument that class members' claims did not accrue until that date—in which case this action satisfies even Louisiana's one year statute of limitations. Reply at 13. Specifically, less than 9 months elapsed between the release of the

transcripts on May 9, 2016, and Plaintiffs initiating this suit on February 2, 2017.

The foregoing is not meant to establish that Plaintiffs' claims did or did not accrue on a certain date. Rather, the point is that Apple's failure to explain why the statute of limitations distinction matters based on the facts of this case dooms its argument. The Court agrees that the statute of limitations differences would be material if Plaintiffs' claims accrued on April 16, 2014. But Apple has not argued for an April 16, 2014 accrual date. In fact, Apple has not argued for an accrual date at all. All Apple has done is make the point that different states have different statutes of limitations. Opp. at 21. That is not enough. The mere "fact that two or more states are involved does not itself indicate that there is a conflict of law problem. A problem only arises if differences in state law are material, that is, if they make a difference in this litigation." *Mazza*, 666 F.3d at 590 (internal quotation marks and citation omitted). Because Apple has not attempted to explain why differences in state statutes of limitations make a difference in this litigation, the Court cannot find that the differences are material.

A similar problem confronted the district court in *In re Packaged Seafood Products Antitrust Litigation*, 277 F. Supp. 3d 1167 (S.D. Cal. 2017). As here, the defendants argued that statutes of limitations were materially different and therefore barred a nationwide class. *Id.* at 1180–81. The district court rejected this argument:

> Defendants nowhere address whether the statutes of limitations might actually preclude certain claims <u>given the facts of this case</u>, and even Defendants' sole authority (which is contradicted by several cases Plaintiffs offer) rested its relevant analysis on such a showing. Furthermore, Plaintiffs assert that "all the consumer claims at issue are timely under any of the relevant statutes of limitation" and Defendants nowhere counter this statement. Accordingly, Defendants have not here shown that the differing statutes of limitation are material within the meaning of *Mazza*.

*Id.* at 1181 (internal citations omitted). The Court finds this reasoning persuasive, and adopts it. It is not enough to simply note that different statutes of limitations exist. Apple must actually explain why those differences might matter for this case, especially because it has been obvious since the outset that Plaintiffs believe Apple's conduct did not emerge until the 2016 patent litigation. *See*

36

*Grodzitsky v. Am. Honda Motor Co. Inc.*, 2014 WL 718431, at *8–9 (C.D. Cal. Feb. 19, 2014) ("California's choice-of-law analysis must be conducted on a case-by-case basis because it requires analyzing various states' laws under the circumstances of the particular case and given the particular legal issue in question."); *Mullins v. Premier Nutrition Corp.*, 2016 WL 1535057, at *10 (N.D. Cal. Apr. 15, 2016) ("At the class certification stage, other district courts have rejected blind reliance on *Mazza*, and instead require defendants to provide case-specific analysis as to the second and third prongs of the governmental interest test."). In sum, the Court rejects Apple's argument that differences between statutes of limitations are material here.

Nevertheless, the Court agrees with Apple's third argument that the level of interference required for a trespass to chattels claim materially differs from state to state. To prevail on a claim for trespass to a computer system or similar device, California law requires the plaintiff to show that the trespass "(1) caused physical damage to the personal property, (2) impaired the condition, quality, or value of the personal property, or (3) deprived plaintiff of the use of personal property for a substantial time." *Grace*, 2017 WL 3232464, at *11 (quoting *Fields*, 2013 WL 5340490, at *4). Plaintiffs are here proceeding under the second of these options and argue in particular that Apple's conduct harmed them by diminishing the value of their iPhones.

The problem for Plaintiffs is that Apple has provided authority—whose accuracy Plaintiffs do not dispute—indicating that other states would permit liability even absent a showing of harm. For instance, in Iowa "[i]f a party cannot prove actual injury, the law entitles him to recover nominal damages." *Sheridan v. City of Des Moines*, 2000 WL 35626707, at *4 (S.D. Iowa Aug. 10, 2000). Likewise, in Florida "[a]ny unlawful interference, *however slight*, with another's enjoyment of his or her personal property is a trespass, forcible dispossession being unnecessary as a rule." *Am. Fed'n of Labor-Cong. of Indus. Organizations v. City of Miami*, 2008 WL 11333331, at *9 (S.D. Fla. Sept. 4, 2008) (quoting 55 Fla. Jur. 2d Trespass § 3 (1984)) (emphasis added). Thus, Florida would permit liability even absent physical damage, impairment, or deprivation—the interference is enough. Similarly, North Carolina does not require "actual

United States District Court
Northern District of California

damage as an essential element" of a trespass to chattels claim where "actual damage" is defined as "some actual loss, hurt or harm resulting from the illegal invasion of a legal right." *Hawkins v. Hawkins*, 101 N.C. App. 529, 532–33 (1991). In other words, North Carolina permits liability for trespass to chattels even if the plaintiff does not show they suffered "some actual loss, hurt or harm resulting from the illegal invasion of a legal right." *Id.* at 532. The bottom line, then, is that Apple points to significant authority showing that California's trespass to chattels law differs materially from that of other states.

Plaintiffs have chosen not to contest or respond to Apple's characterization of other states' trespass to chattels laws. Instead, Plaintiffs argue that the differences Apple highlights are not material and therefore do not preclude a nationwide class. The Court disagrees. Apple has consistently argued that it cannot be liable because the FaceTime Break did not cause class members any actual harm. The distinction between a state like California that requires some degree of harm and states like Florida, North Carolina, and Iowa that do not is therefore highly material because applying those states' laws in place of California's could "spell the difference between the success and failure of a claim." *In re Yahoo Mail*, 308 F.R.D. at 602 (quoting *Mazza*, 666 F.3d at 591). Put otherwise, the differences are material because if Apple's no harm theory is correct, Apple cannot be liable in California but may still be liable in Florida, North Carolina, or Iowa. *Mazza* itself underscores the point. The Ninth Circuit there found that the existence of absence of a reliance requirement in different states' consumer protection laws—in essence, a requirement that a plaintiff show that a defendant had caused them harm—constituted a material difference. *Mazza*, 666 F.3d at 591.

In sum, the Court finds that Plaintiffs' California UCL and trespass to chattels claims differ materially from other states' analogous laws. The Court now turns to the second step in the inquiry, whether other states have an interest in applying their laws.

### b. Other States' Interests

"[S]tates may permissibly differ on the extent to which they will tolerate a degree of

38

lessened protection for consumers to create a more favorable business climate for the companies that the state seeks to attract to do business in the state." *Mazza*, 666 F.3d at 592; *see id.* ("[T]he district court erred by discounting or not recognizing each state's valid interest in shielding out-of-state businesses from what the state may consider to be excessive litigation."). Consequently, "each state has an interest in setting the appropriate level of liability for companies conducting business within its territory." *Id.*; *In re Yahoo Mail*, 308 F.R.D. at 603 ("Each state has an interest in being able to delineate the appropriate standard of liability and the scope of recovery based on its understanding of the balance between the interests of individuals and corporate entities operating within its territory.").

There is no doubt that Plaintiffs' UCL claim implicates other states' interests in balancing business climate and consumer protections. The Ninth Circuit in *Mazza* recognized that other states' interest in balancing business climate and consumer protections applied in the putative 44 state consumer class action, which likewise alleged *inter alia* a violation of the UCL. *Mazza*, 666 F.3d at 587, 592–93; *Potter v. Chevron Prods. Co.*, 2018 WL 4053448, at *11 (N.D. Cal. Aug. 24, 2018) (another prospective class action involving a claim under the UCL that found states' balancing interest was implicated); *Frezza v. Google Inc.*, 2013 WL 1736788, at *7 (N.D. Cal. Apr. 22, 2013) (same).

Similarly, the Ninth Circuit and the California Supreme Court have both recognized that other jurisdictions have an interest in seeing their tort laws applied to injuries that occurred within their borders. *McGhee v. Arabian Am. Oil Co.*, 871 F.2d 1412, 1425 (9th Cir. 1989), *as amended on reh'g* (Apr. 28, 1989) ("Saudi Arabia has some legitimate interest in seeing that Saudi law determines the consequences of actions within its borders causing injury to people who reside there."); *Offshore Rental Co. v. Cont'l Oil Co.*, 22 Cal. 3d 157, 160, 168 (1978). The California Supreme Court's *Offshore Rental* decision is especially relevant. *Offshore Rental* held that Louisiana law should apply over California law where the plaintiff was a California resident, the alleged tort (negligence) occurred in Louisiana, and defendant corporation was a citizen of neither

state. The opinion stressed Louisiana's "vital interest in promoting freedom of investment and enterprise within Louisiana's borders" and found this interest prevailed over California's interest in compensating its residents. *Offshore Rental*, 22 Cal. 3d at 168; *see McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 91–94 (2010) (discussing *Offshore Rental* and affirming its continued vitality).

In sum, other states have an interest in seeing their laws applied to Plaintiffs' claims. The Court now balances those states' interests against California's interest in seeing its law applied.

### c. Balance of Interests

California law generally recognizes that "with respect to regulating or affecting conduct within its borders, the place of the wrong has the predominant interest." *Mazza*, 666 F.3d at 593 (citation omitted). "California considers the 'place of the wrong' to be the state where the last event necessary to make the actor liable occurred." *Id.*

Plaintiffs argue that the place of the wrong is California because that is where Apple undertook the actions which caused the FaceTime Break. Plaintiffs point to *McCann*, in which a California plaintiff sued a Delaware[10] corporation in tort for exposing the plaintiff to asbestos in Oklahoma. *McCann*, 48 Cal. 4th at 74, 91. *McCann* applied California's choice of law test and concluded that Oklahoma law should apply over California's. Specifically, *McCann* found that the plaintiff's claim had accrued where he was exposed to asbestos (*i.e.* Oklahoma) rather than where the plaintiff fell ill and sued (*i.e.* California). *Id.* at 101–02.

It is unclear why Plaintiffs believe that *McCann* supports their argument. *McCann* did not hold that the plaintiff's claim accrued where the asbestos was manufactured, but rather held that the claim accrued where the plaintiff himself was exposed to the asbestos. Likewise, class members' claims did not accrue in California where the FaceTime Break originated, but rather in the state in which class members' iPhones ceased being able to use FaceTime. Framed differently,

---

[10] The corporation was incorporated in Delaware, but was headquartered in New York. *McCann*, 48 Cal. 4th at 91.

40

the last event necessary to make Apple liable was the loss of FaceTime access on class members' iPhones, and that event took place wherever a given class member was on April 16, 2014.

*Mazza* underscores the point. There, a putative class with members in 44 states accused Honda of misrepresenting the characteristics of its braking system in marketing materials. *Mazza*, 666 F.3d at 585, 587. Honda was a California corporation, and the marketing materials had been created in California. *Id.* at 597 (Nelson, J., dissenting). Even so, *Mazza* found California law could not apply to out of state class members because "the last events necessary for liability as to the foreign class members—communication of the advertisements to the claimants and their reliance thereon in purchasing vehicles—took place in the various foreign states, not in California." *Id.* at 594.

The Court grants that *Mazza* was a false advertising case, and this suit is not. Even so, *Mazza* likewise concerned a UCL claim and its key finding—that a claim accrues where the harm is felt rather than where it originated—remains fully applicable here. The Court therefore finds that the place of the wrong here is where class members were exposed to the FaceTime Break, even if many of Apple's actions preceding the exposure took place in California. *Cf. Brazil*, 2014 WL 2466559, at *14 ("The place of the wrong is the geographic location where the misrepresentations were communicated to the consumer."); *Frezza*, 2013 WL 1736788, at *5–7 (relying on *Mazza* to reach similar conclusion).

In sum, because the place of the wrong was the state in which each class member was exposed to the FaceTime Break each class member's claims should be governed by the law of the state in which they were exposed to the FaceTime Break. Consequently, the Court will not certify a nationwide class because doing so would require application of all 50 states' laws. However, this does not bar certification of Plaintiffs' alternative California-only class.

### C. Rule 23(b)(3) Superiority

Rule 23(b)(3) provides four factors that a court must consider in determining whether a class action is superior to other methods of adjudication. These factors are:

41

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). "[T]he purpose of the superiority requirement is to assure that the class is the most efficient and effective means of resolving the controversy." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting 7A Charles Wright, Arthur Miller & Mary Kay Kane, Federal Practice and Procedure, § 1779 at 174 (3d ed. 2005)). "In cases in which plaintiffs seek to recover relatively small sums and the disparity between litigation costs and the recovery sought may render plaintiffs unable to proceed individually, 'class actions may permit the plaintiffs to pool claims which would be uneconomical to bring individually.'" *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 622 (C.D. Cal. 2015) (quoting *Local Joint Executive Bd. Of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001)).

Apple's brief superiority argument is that the proposed class will be hard to manage owing to the difficulty in determining who is actually a class member. Specifically, Apple argues that determining membership will be difficult because there is no "systematic way to identify which current iPhone 4 and 4S users owned the same devices on April 16, 2014 and which operating system they were running at the time." Opp. at 24. Apple's argument assumes that class membership is limited to individuals who still own the iPhone 4 or iPhone 4S that they owned at the time of the FaceTime Break. This assumption is mistaken. As Plaintiffs point out, the proposed class definitions base class membership on whether an individual owned an iPhone 4 or iPhone 4S on April 16, 2014, *i.e.* when the FaceTime Break occurred. Thus, whether class members continue to own the same devices over 4 years later, or have sold them, given them away, or otherwise disposed of them is beside the point. What matters for class identification purposes is whether an individual owned an iPhone 4 or iPhone 4S running iOS 6 on April 16, 2014. Apple has already

indicated that it can provide this information. ECF No. 224-19 at 2 (Apple responding to interrogatory requesting identification of class members by "refer[ring] Plaintiffs to … [a] report that shows the iOS version used by U.S. Apple iPhone 4 and/or iPhone 4S users as identified by serial number for each of April 15, 16th, and 17th of 2014 and …[a] report … that shows U.S.-only Apple iPhone 4 and/or iPhone 4S users with iOS versions older than iOS 7, as identified by serial number, from April 16, 2014 onwards.").

In sum, Plaintiffs have established Rule 23(b)(3) superiority. Plaintiffs have also established Rule 23(b)(3) predominance for the amended California class, and have satisfied the requirements of Rule 23(a). The Court will therefore certify a Rule 23(b)(3) amended damages class. The Court now turns to whether certification of a Rule 23(b)(2) class is also appropriate.

**D. Rule 23(b)(2)**

Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." *Dukes*, 564 U.S. at 360 (quoting Fed. R. Civ. P. 23(b)(2)). "[U]nlike Rule 23(b)(3), a plaintiff does not need to show predominance of common issues or superiority of class adjudication to certify a Rule 23(b)(2) class." *In re Yahoo Mail*, 308 F.R.D. at 587. Rather, "[i]n contrast to Rule 23(b)(3) classes, the focus [in a Rule 23(b)(2) class] is not on the claims of the individual class members, but rather whether [the defendant] has engaged in a 'common policy." *Id.* at 599.

Plaintiffs' 25 page motion for class certification devotes a single four-sentence paragraph to argue for certification of a Rule 23(b)(2) class. Of that paragraph, the only statement approaching a legal argument is that "[c]ertification under Rule 23(b)(2) is proper because Apple's wrongful conduct affected all Class members in the same way." Mot. at 25. Underscoring the point, Plaintiffs do not specify the injunctive relief they seek in their complaint or their motion for class certification—both filings refer instead to a boilerplate request for "appropriate injunctive relief" or "injunctive relief to remedy Apple's continuing wrongful conduct." Compl. at 35; Mot.

United States District Court
Northern District of California

at 25. Similarly, over 14 months after filing this lawsuit, Plaintiffs refused on April 16, 2018, to respond to Apple's interrogatory which requested that Plaintiffs "[i]dentify precisely the injunctive relief You seek in this case." *See* ECF No. 199-5 at 1–2. Plaintiffs' first attempt to define the injunctive relief at issue is in the reply to their motion for class certification, which has deprived Apple of any chance to respond to their request. Reply at 15 (suggesting the Court should require Apple to "(i) disclos[e] when certificates are programmed to expire and what features will be affected; and (ii) allow iPhone devices to install earlier iOS versions"). The Court therefore finds that Plaintiffs' argument as to the form of injunctive relief has been waived. *Bazuaye v. INS*, 79 F.3d 118, 120 (9th Cir. 1996) ("Issues raised for the first time in the reply brief are waived."); *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."); *John-Charles v. California*, 646 F.3d 1243, 1247 n.4 (9th Cir. 2011) (holding party "failed to develop any argument on this front, and thus has waived it"); *see Diacakis v. Comcast Corp.*, 2013 WL 1878921, at *9 (N.D. Cal. May 3, 2013) (finding injunctive relief request in motion for class certification "not well taken" when "request[ed] in a footnote which is devoid of any meaningful analysis").

In sum, the Court denies certification of a Rule 23(b)(2) class. The Court now turns to Plaintiffs' motion to strike.

### E. Motion to Strike

Plaintiffs have filed a motion to strike the report of Dr. Avi Rubin ("Dr. Rubin"), Apple's technical expert. ECF No. 200-4, First Declaration of Avi Rubin ("First Rubin Decl."). Plaintiffs object to four main aspects of Dr. Rubin's report. First, Plaintiffs seek to strike Dr. Rubin's opinion that the FaceTime usage of Grace's iPhone 4 is minimal. Second, Plaintiffs seek to strike Dr. Rubin's opinion that Potter is not typical of the class because the performance issues on his 32 GB iPhone 4 were due to Potter "jailbreaking" the 32 GB iPhone. Third, Plaintiffs seek to strike Dr. Rubin's opinion that Potter's (un-jailbroken) 16 GB iPhone may not be typical because it was subject to a factory reset. Fourth, Plaintiffs seek to strike Dr. Rubin's testimony that Apple did not

intentionally cause the FaceTime Break.

The Court rejects Plaintiffs' attempt to strike Dr. Rubin's analysis of Grace's FaceTime usage. Plaintiffs' main argument in support of striking this analysis is that Dr. Rubin initially stated that Grace did not use FaceTime, but later amended his report to state Grace's iPhone 4 used FaceTime at least once. ECF No. 223-4 at 1. However, the neutral evaluator who examined Grace's iPhone 4 initially represented that it did not have any FaceTime calls logged, before later providing an output file indicating at least one FaceTime use occurred. ECF No. 223-4 at 2. Dr. Rubin's amendment may therefore simply reflect this change. Plaintiffs can certainly cross-examine Dr. Rubin on the change at trial, but the change speaks to the weight of Dr. Rubin's opinions rather than their admissibility. As this Court has noted, "[e]xpert testimony is admissible pursuant to Rule 702 if it is both relevant and reliable." *Hadley v. Kellogg Sales Co.*, 2018 WL 3954587, at *14 (N.D. Cal. Aug. 17, 2018) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). Dr. Rubin's opinion that Grace used FaceTime infrequently, if at all, is highly relevant to the underlying question of damages. Second Rubin Decl. at 16–17. The minimal FaceTime usage on Grace's iPhone 4 suggests the feature was not an important part of the iPhone 4's value, thereby undermining Plaintiffs' theory that the FaceTime Break diminished affected iPhones' value by 12 percent. Dr. Rubin's opinion is also reliable given that he is a Professor of Computer Science at Johns Hopkins University with an extensive background in information security issues and has explained the bases for his conclusions in his report. *Id.* at 1–2, 16–17.

The Court also rejects Plaintiffs' attempt to strike Dr. Rubin's opinion that Potter's 32 GB iPhone 4 cannot support typicality because performance problems may be attributable to jailbreaking. As explained above, the Court agrees with Apple that Potter's clams based on his jailbroken 32 GB iPhone 4 are not typical of the class. Plaintiffs' theory of the case is that the FaceTime Break harmed class members were harmed by forcing them to choose between (1) keeping iOS 6 and losing FaceTime, or (2) upgrading to iOS 7 and keeping FaceTime, but experiencing performance problems. Dr. Rubin's opinion is therefore relevant because it means a

United States District Court
Northern District of California

jailbroken iPhone like Potter's 32 GB iPhone 4 gives rise to the unique defense that performance issues are not, in fact, attributable to the FaceTime Break. *See Hanon*, 976 F.2d at 508 ("[C]lass certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."). Dr. Rubin's opinion is also reliable because examining the potentially deleterious effects of jailbreaking on iPhone performance is based on his expertise in the information security area and he sets forth the bases for his opinion in his report. Second Rubin Decl. at 18–24.

Finally, the Court declines to decide Plaintiffs' remaining two contentions because they are not relevant at the class certification phase. The factory reset of Potter's 16 GB iPhone 4 has no bearing on how much the FaceTime Break reduced the device's market value, and that is the focal point of Plaintiffs' case. Similarly, whether or not Apple intended to cause the FaceTime Break may be relevant to the ultimate liability determination but does not speak to whether or not a class can be certified at this juncture.

The Court therefore DENIES Plaintiffs' motion to strike.

### F. Evidentiary Objections

Apple has filed objections to evidence submitted by Plaintiffs in connection with Plaintiffs' reply in support of class certification. ECF No. 235. The Court DENIES Apple's objections because the Court would reach the same outcome with or without the material to which Apple objects. The only objected-to evidence referenced in the instant order is Dr. Hastings's statement that "all major platforms benchmark their phone offers against wholesale market prices." Hastings Reply Report at 19. Even if the Court's decision depended on this evidence— and it does not—the Court would find that considering the evidence was appropriate because Plaintiffs raise it in direct response to Defendants' opposition brief. Opp. at 16 ("Dr. Hastings also relies on a misleading data set, while ignoring more relevant data regarding the value of class members' phones. She does not evaluate the amount class members could have received for their devices either before or after April 16, 2014." (internal citation omitted)); *Defs. of Wildlife v. U.S.*

United States District Court
Northern District of California

*Fish*, 2016 WL 4382604, at *10 (N.D. Cal. Aug. 17, 2016) (court may consider reply evidence "offered in direct response" to issues raised in opposition); *see Terrell v. Contra Costa Cty.*, 232 F. App'x 626, 628–29 & n.2 (9th Cir. 2007) (evidence responding to recitation of facts in opposition is not "new" and may be considered on reply).

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS in part and DENIES in part Plaintiffs' motion for class certification. The Court CERTIFIES a class seeking restitution and damages for violation of the UCL and trespass to chattels pursuant to Rule 23(b)(3):

> All owners of non-jailbroken Apple iPhone 4 or Apple iPhone 4S devices in California who on April 16, 2014, had iOS 6 or earlier operating systems on their iPhone 4 or iPhone 4S devices.

The Court APPOINTS Ken Potter, only as to his 16 GB iPhone 4, and Christina Grace as representatives of the class. As Apple does not challenge the adequacy of proposed class counsel, the Court also APPOINTS as class counsel Jill M. Manning of Steyer Lowenthal Boodrookas Alvarez & Smith LLP, Daniel L. Warshaw of Pearson, Simon & Warshaw LLP, John Austin Curry of Caldwell Cassady & Curry LLP, and David F.E. Tejtel of Friedman Oster & Tejtel PLLC.

**IT IS SO ORDERED.**

Dated: September 18, 2018

_____
LUCY H. KOH
United States District Judge