# EXHIBIT 4

Page 1

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA
2                  SAN JOSE DIVISION

3    _____

4    CHRISTINA GRACE and KEN POTTER,          **CERTIFIED**
     Individually and on Behalf of            **TRANSCRIPT**
5    All Others Similarly Situated,

6              Plaintiffs,

7
          -vs-                      No. 5:17-cv-00551-LHK-NC
8

9    APPLE INC,

10             Defendant.
     _____
11

12        ** HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY **

13         VIDEO DEPOSITION OF DR. MARK T. JONES

14              8:32 a.m. to 5:32 p.m.

15              September 24, 2018

16              Blacksburg, Virginia

17

18

19

20

21

22

23

24   Job No. 37982/307500

25        REPORTED BY:  Rhonda D. Tuck, RPR, CRR



Page 2

1          Video Deposition of DR. MARK T. JONES,

2    taken and transcribed on behalf of the Defendant, by

3    and before Rhonda D. Tuck, RPR, CRR, Notary Public

4    in and for the Commonwealth of Virginia at large,

5    pursuant to Rule 30 of the Federal Rules of Civil

6    Procedure, and by Notice to Take Depositions;

7    commencing at 8:32 a.m., September 24, 2018, at The

8    Inn at Virginia Tech and Skelton Conference Center,

9    901 Prices Fork Road, Blacksburg, Virginia.

10

11    APPEARANCES OF COUNSEL:

12

13           CALDWELL CASSADY & CURRY

14             2101 Cedar Springs Road, Suite 1000

15             Dallas, Texas 75201

16             (214) 888-4848

17             acurry@caldwellcc.com

18        BY:  J. AUSTIN CURRY, ESQUIRE

19             Counsel for the Plaintiffs

20

21

22

23

24

25



GRACE: DR. MARK T. JONES - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1   APPEARANCES OF COUNSEL CONTINUED:

 2

 3              DURIE TANGRI

 4                 217 Leidesdorff Street

 5                 San Francisco, California 94111

 6                 (415) 362-6666

 7                 enovikov@durietangri.com

 8         BY:   EUGENE NOVIKOV, ESQUIRE

 9                 Counsel for the Defendant

10

11

12

13   ALSO PRESENT:

14   J.B. STEPHENS - Videographer

15   GABE ZELDIN, ESQ., Apple Inc. (Telephonically)

16   AVIEL RUBIN (Telephonically)

17

18

19

20

21

22

23

24

25
```



GRACE: DR. MARK T. JONES - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 4

1                    I N D E X

2

   WITNESS:  DR. MARK T. JONES
3
       Examination by Mr. Novikov...........................6
4

5
                   E X H I B I T S
6

7   Jones Exhibit Number 193.............................11
      Y2K Bug Encyclopedia Entry

8   Jones Exhibit Number 194.............................15
      Expert Report of Dr. Mark T. Jones
9
   Jones Exhibit Number 195.............................17
10     Merriam-Webster Definition of "Bug"

11  Jones Exhibit Number 196.............................20
      Emails, Bates-numbered APL-GRACE_00007274 to
12     APL-GRACE_00007277

13  Jones Exhibit Number 197.............................23
      Email, Bates-numbered APL-GRACE_00056772 to
14     APL-GRACE_00056786

15  Jones Exhibit Number 198.............................60
      "Certificates - Apple Developer Documentation"
16
   Jones Exhibit Number 199.............................65
17     "RFC 5280 - Internet X.509 Public Key Infrastructure
      Certificate and Certificate Revocation"
18
   Jones Exhibit Number 200.............................87
19     "Policies - Apple Developer Documentation"

20  Jones Exhibit Number 201............................122
      Emails, Bates-numbered APL-GRACE_00024933 to
21     APL-GRACE_00024938

22  Jones Exhibit Number 202............................172
      Graphs, Bates-numbered AKAM-0052 to AKAM-0109
23
   Jones Exhibit Number 203............................172
24     Graph "Overall FaceTime User Traffic (Rolling Max)"

25                  * * * * *



Case 5:17-cv-00551-LHK   Document 278-5   Filed 10/04/18   Page 6 of 18
GRACE: DR. MARK T. JONES - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 70

1      A.      I think in a typical system, it would be

2   good to check the expiration dates.

3      **Q.      So what you're saying here really is that**

4   **it was technically possible not to check the**

5   **expiration dates?**

6      A.      Well, not only can you technically

7   possible not check the expiration dates, you can

8   take different actions based on whether the

9   certificate is expired or not.

10     **Q.      On that same page, actually right above**

11  **that -- and I don't really mean to go in reverse**

12  **order, but that's the way things shook out -- you**

13  **say, "I note that while the certificates in this**

14  **chain were created in the 2007 timeframe to have**

15  **certain validity periods, Apple could have created**

16  **certificates with the same hierarchy of authorities**

17  **with updated expiration dates when developing the**

18  **FaceTime feature in the 2009 and 2010 timeframe."**

19          **Do you see that?**

20     A.      Yes.

21     **Q.      What does that mean?**

22     A.      That Apple could have created new

23  certificates for at least portions of the chain and

24  used those with updated expiration dates.

25     **Q.      Got it.  So it would have been an all new**



Page 71

1  set of certificates that they would have created for

2  this purpose, in your hypothetical?

3      A.     It wouldn't have required all new.  They

4  had the freedom to do whatever they wanted with

5  respect to those certificates, but they wouldn't

6  have required the entire chain to be new.  That,

7  however, was under their control.

8      Q.     Okay.  So either they could have gotten

9  new, like bottommost lease certificates issued or

10 some -- could have built a new subset of the chain

11 for this purpose, is essentially what you're saying?

12     A.     Those are both things they could have

13 done.  Yes.

14     Q.     Was there a reason to do that at the

15 time, as opposed to use these certificates, that you

16 can think of?

17     A.     If you didn't want the system to be

18 unable to operate past a certain date, then yes,

19 that would be a good reason.

20     Q.     Okay.  Do you agree that the private keys

21 of a certificate should be renewed periodically?

22     A.     It depends on the circumstances.  It

23 certainly is possible that I want to update a

24 certificate from time to time.  Yes.

25     Q.     Just as a matter of computer security



Page 72

1   best practices, is that something that you would

2   want to do from time to time in a situation like

3   this?

4       A.    I don't know that I'd want to do it

5   periodically, because there's always risk to

6   changing things.  It would depend whether I had a

7   reason to do it or not.

8       Q.    Well, I guess you mentioned -- when I

9   asked you why expiration is sometimes checked, you

10  said that one reason is that keys can sometimes be

11  compromised, and as computational power increases

12  encryption once thought to be powerful turns out not

13  to be as powerful as you thought.

14          Aren't those kind of general reasons why

15  you would want to do this from time to time?  And by

16  "this," I mean renew private keys and certificates?

17      A.    It would depend on if there were changes

18  that were relevant during that timeframe, in terms

19  of what my key size was set to, for example.  It

20  also may depend on how much I want to rely on the

21  capability to revoke certificates.

22      Q.    So you don't agree that as a general

23  principle it is a good security practice to renew

24  certificate keys periodically.  Is that fair?

25      A.    I would say it's not a universal rule.



Page 73

1    There's certainly cases where it would be a good

2    practice.  It would depend on balancing the risks

3    between renewing it and not renewing it.

4         Q.    Okay.  Do you know what the certificate

5    revocation list is in this context?

6         A.    Sure.

7         Q.    Is that something that's maintained by

8    the certificate authority?

9         A.    At some level.  I don't recall how it's

10   done now in the infrastructure.  My recollection is

11   there have been changes to make it efficient, but I

12   don't recall the specifics of who's responsible for

13   both maintaining and also propagating the list.

14        Q.    Okay.  Is it right that the certificate

15   revocation list under the X.509 standard will only

16   have information about unexpired certificates?

17        A.    I don't know one way or the other.

18        Q.    Okay.  Could you take a look back at the

19   last exhibit, 199, in the same section that we were

20   looking at before, 4.1.2.5, the first sentence in

21   particular.

22        A.    I see that.

23        Q.    Does that suggest to you that the

24   revocation list is only going to have information

25   about certificates that aren't expired?



Page 108

1   weren't followed completely within FaceTime?

2       A.      No.

3       Q.      So you would agree -- would you agree

4   that it was impossible -- it would have been

5   impossible for Apple to change the expiration date

6   on the Device Sub-CA after it was coded in 2007?

7       A.      I am not sure what you mean by it was --

8   I guess both by change and coding it.

9       Q.      So on Page 21 of your report, you say,

10  "The device certificate expiration dates are stored

11  as data in the certificates themselves."

12          Do you see that?

13      A.      Yes.

14      Q.      I guess my question is, once that occurs

15  and the certificate is created and the expiration

16  date is set, do you agree with me that date cannot

17  be changed and have that certificate remain valid?

18      A.      Effectively, yes.  It requires me to be

19  able to -- to change something in the certificate

20  after the fact would require me to forward the

21  certificate, and that is not generally viewed as a

22  computationally feasible task.

23      Q.      For the Device Sub-CA, that expiration

24  date was coded in 2007, correct?

25      A.      Again, I guess the word -- I'm not sure



GRACE: DR. MARK T. JONES - HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 110

1    proposed.

2        Q.    Okay.  And how much -- how long after the

3    dates were the original -- I'm having trouble.  It's

4    after lunch.

5            How long after the dates were originally

6    proposed did Mr. De Atley change them?

7        A.    Without looking back at the email chain,

8    I don't know if I have -- I've cited to the

9    documents, but I -- let me see.  I've got a March --

10   maybe -- if I'm -- I believe it's four days, but I

11   really would want to check to make sure that's

12   correct.

13       Q.    Got it, and the certificate -- at the

14   time that Mr. De Atley changed the dates, the

15   certificate hadn't been created yet.  Is that your

16   understanding?

17       A.    Yes.

18       Q.    Do you know in 2007 how many people were

19   involved in this process of creating the certificate

20   framework at Apple?

21       A.    No.

22       Q.    Do you think it was like a whole team?

23       A.    In terms of making the decision?  I guess

24   I'm not sure what you're asking me, but I don't know

25   how many people were part of the decision-making



Page 112

1    like.

2         A.    I believe it was June 2010.

3         Q.    Yep.

4         A.    I could check that, but that's what comes

5    to mind.

6         Q.    **Do you know when either Ms. Grace or**

7    **Mr. Potter bought their iPhone 4 units?**

8         A.    Not off the top of my head, no.

9         Q.    **Does that matter to your analysis at all?**

10        A.    It doesn't change my technical analysis,

11   no.

12        Q.    **Did Apple do anything between when they**

13   **would have bought their phones to when this Device**

14   **Sub-CA expired to affect the date that it would**

15   **expire?**

16        A.    In terms of the Device CA?

17        Q.    **Yes.**

18        A.    Not that I'm aware of, no.

19        Q.    **Did Apple do anything that you're aware**

20   **of to interfere with Mr. Potter's or Ms. Grace's**

21   **physical possession of their device?**

22        A.    Not that I'm aware of, no.  You're

23   talking about just like physically holding it?

24        Q.    **Yes.**

25        A.    Not that I know of.



Page 113

1    Q.    Does it make sense to you to call this a

2  trespass case?

3    A.    I understand that a trespass is at issue,

4  but I also understand a context under which I can

5  trespass rights that aren't physical.  So I suppose

6  it does, but we're into specifically requirements

7  that are just kind of beyond my --

8    Q.    Legal territory?

9    A.    Yeah.

10    Q.    Do you think that the team that created

11  these certificates in 2007 intended for FaceTime to

12  break for users on iOS 6 in 2014?

13    A.    I don't know that they were even aware

14  that FaceTime was -- I don't even know if FaceTime

15  was contemplated at Apple in 2007, let alone whether

16  this team was aware of it.

17    Q.    What about the people who coded the X.509

18  framework into FaceTime in 2009 and 2010, in that

19  timeframe?  Have you seen any evidence that they

20  intended for FaceTime to break for users in April of

21  2014?

22    A.    I don't know what their intention was.  I

23  believe that they would have been aware of the

24  expiration date of the various certificates at that

25  time.



Page 115

1  in the company and it was a -- it's not a programmer

2  error.  I've seen no explanation for how it's a

3  programmer error when it's doing exactly what it was

4  meant to do.

5      **Q.    What are you referring to there when you**

6  **say, "It's doing exactly what it was meant to do"?**

7      A.    The code was designed to check the

8  expiration date of the certificate and the

9  certificates in the chain, and that's exactly what

10  it did.

11      **Q.    But do you think that the behavior, the**

12  **resulting behavior of FaceTime calls failing for a**

13  **set group of users -- was that the intended**

14  **behavior, in your view?  Because I think we just**

15  **established that you didn't think there was any**

16  **evidence that that was anybody's intent at least in**

17  **2007 and 2010.**

18      A.    In 2007 and 2010, I haven't seen evidence

19  that there was an intent to have FaceTime fail.

20      **Q.    So when did that intent manifest?**

21      A.    I haven't seen any intent to have it fail

22  beyond the settings of the certificate dates and

23  coding to check the certificate expirations.  There

24  certainly wasn't -- but I just haven't seen enough

25  discussions to know whether there was intent beyond



Page 118

1    Q.    **Okay.**

2    A.    But they already had code available to

3  them that would check and acquire certificates over

4  the internet.

5    Q.    **Why would they build a system -- what**

6  **would be the motivation for building a system that**

7  **failed for a substantial number of users either**

8  **seven years later or four years later, depending on**

9  **what timeframe you're looking at?**

10   A.    It can be a desire to have people upgrade

11  to new versions of an operating system.  It can be a

12  desire to have people buy new versions of the phone.

13   Q.    **Okay.  Do you really think that -- we'll**

14  **just focus on 2010 to make it easier.  Do you really**

15  **think that in 2010 the people making FaceTime**

16  **thought, "Aha, I'm going to design this to break in**

17  **four years for a whole bunch of people so they have**

18  **to upgrade to a new iOS version or buy a new phone"?**

19   A.    I can't know one way or the other whether

20  that's their intent.  Just like I can't know whether

21  or not it was their intent to change this down the

22  line.

23   Q.    **You haven't seen any evidence that that's**

24  **the case, that it was the intent to have the system**

25  **break so that people would buy new phones or**



Page 119

1    upgrade?

2        A.      Certainly not in 2010, no.

3        Q.      Or in 2007?

4        A.      Or in 2007.

5        Q.      When was the first -- did you see such

6    intent manifest later?

7        A.      I have seen discussions of the benefits

8    of it breaking for iOS 6 with respect to relay

9    usage.

10       Q.      Have you seen such discussions from

11   before April 16th, 2014?

12       A.      If I have seen them in this case, they

13   would be cited in my report.

14       Q.      Okay.  Do you cite to any in your report?

15       A.      I would have to look back.  I'm not

16   certain one way or the other.

17       Q.      Okay.  Why don't you take a look, because

18   I think this is important.

19       A.      I don't know that merely looking at the

20   citations is going to tell me in all cases what's in

21   them.

22       Q.      Okay.  Then I guess there's probably no

23   point in your looking, but is there anywhere -- I

24   mean, do you point -- it seems like a pretty

25   important fact.  Do you point it out in the text of



Page 121

1    break point, and I think we're about to run out

2    of tape.  So let's take ten.

3            THE VIDEOGRAPHER:  The time on the

4    monitor is 1:48 p.m., and we are off the record.

5    This is the end of DVD Number 2.

6            (Break in proceedings.)

7            THE VIDEOGRAPHER:  This is the beginning

8    of DVD Number 3.  The time on the monitor is

9    1:56 p.m., and we are now back on the record.

10   BY MR. NOVIKOV:

11       Q.    I just want to circle back to one thing

12   that we talked about in the last round, just to make

13   something clearer.

14            When you say in your report that the

15   device -- that the certificate expiration dates were

16   accelerated, you're referring to Dallas De Atley's

17   response to the initial proposal four days after it

18   was made in 2007 and before the certificates were

19   created, correct?

20       A.    Yes.

21       Q.    You don't have anything else in mind when

22   you talk about the expiration dates being

23   accelerated?

24       A.    Correct.

25            MR. NOVIKOV:  I'm going to mark the next



Page 226

1 COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2      I, Rhonda D. Tuck, RPR, CRR, Notary Public in and

3 for the Commonwealth of Virginia at Large, and whose

4 commission expires on May 31, 2020, do certify that the

5 aforementioned appeared before me, was sworn by me, and

6 was thereupon examined by counsel; and that the foregoing

7 is a true, correct, and full transcript of the testimony

8 adduced.

9      I further certify that I am neither related to nor

10 associated with any counsel or party to this proceeding,

11 nor otherwise interested in the event thereof.

12      Given under my hand and notarial seal at

13 Charlottesville, Virginia, this 27th day of September,

14 2018.

15

16

17

18 _____

19          Rhonda D. Tuck, RPR, CRR

20     Notary Public Registration No. 224847

21      Commonwealth of Virginia at Large
                  DALLAS 69

22

23

24

25 Job No. 37982/307500

