# EXHIBIT 3

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

CHRISTINA GRACE and KEN POTTER, Individually and on Behalf of All Others, Similarly Situated,

        Plaintiffs,

vs.

APPLE, INC.,

        Defendants.

Case No.: 5:17-cv-00551-LHK-NC

**CERTIFIED TRANSCRIPT**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEPOSITION OF:

JUSTINE S. HASTINGS, Ph.D.

Friday, June 8, 2018

8:33 a.m. - 5:18 p.m.

Taken at:

One California Street, Third Floor

San Francisco, California

REPORTED BY: April D. Heveroh, CSR NO. 8759

Page 2

|    |                                                    |
|----|----------------------------------------------------|
| 1  | A P P E A R A N C E S                              |
| 2  |                                                    |
| 3  | FOR PLAINTIFFS:                                    |
| 4  |     PEARSON SIMON WARSHAW, LLP |
| 5  |     BY: DANIEL L. WARSHAW, ESQ.|
| 6  |     15165 Ventura Boulevard, Suite 400 |
| 7  |     Sherman Oaks, California 91403 |
| 8  |     (818) 788-8300             |
| 9  |     dwarshaw@pswlaw.com        |
| 10 |                                                    |
| 11 | FOR PLAINTIFFS:                                    |
| 12 |     STEYER LOWENTHAL BOODROOKAS ALVAREZ & SMITH, LLP |
| 13 |     BY: JILL MANNING, ESQ.     |
| 14 |     One California Street, Third Floor |
| 15 |     San Francisco, California 94111 |
| 16 |     (415) 421-3400             |
| 17 |     jmanning@steyerlaw.com     |
| 18 |                                                    |
| 19 | FOR DEFENDANT APPLE, INC.:                         |
| 20 |     KIRKLAND & ELLIS, LLP      |
| 21 |     BY: R. ALEXANDER PILMER    |
| 22 |     333 South Hope Street      |
| 23 |     Los Angeles, California 90071 |
| 24 |     (213) 688405               |
| 25 |     alexander.pilmer@kirkland.com |

hg

**REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

GRACE: JUSTINE S. HASTINGS, Ph.D. - CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 3

```
 1              A P P E A R A N C E S
 2                    (Continued)
 3
 4   FOR DEFENDANT APPLE, INC.:
 5         KIRKLAND & ELLIS, LLP
 6         BY:  JACOB H. JOHNSTON, ESQ.
 7         555 California Street, 27th Floor
 8         San Francisco, California 94104
 9         (415) 439-1443
10         jacob.johnston@kirkland.com
11
12   FOR DEFENDANT APPLE, INC.:
13         DURIE TANGRI
14         BY:  JOSH H. LERNER, ESQ.
15         217 Leidesdorff Street
16         San Francisco, California  94111
17         (415) 362-6666
18         jlerner@durietangri.com
19
20   ALSO PRESENT:
21         GABE ZELDIN, ESQ., Apple Inc.
22         SUNEEL JAIN, ESQ., for Plaintiffs
23         MARIAH NIEVES, Videographer
24
25                    ---o0o---
```

1  Q.  All right.  So if on a certain date AT&T
2  announced, "Trade in your iPhone and we'll give you $50
3  towards the purchase of a new iPhone," you would expect
4  that that would affect the supply side of the equation,
5  right?
6  A.  It could, all else equal.
7  Q.  And likewise, if somebody on the demand side,
8  the buyer's side of the trade-in market announced that
9  they would provide a subsidy for a trade-in, that would
10 affect the supply side, correct?
11 A.  I'm sorry.  What do you mean by a subsidy for a
12 trade-in?
13 Q.  Well, if they offered to pay you more money for
14 the trade-in of your phone.
15 A.  I'm sorry.  I'm confused.  So we have somebody
16 who's purchasing a phone?  Is that correct?  Somebody
17 who's purchasing a phone, a used phone?
18 Q.  Yep.
19 A.  And they say, "I'm going to -- I know that the
20 market-clearing price is only $50, but I'm willing to
21 pay $70 if anyone would like an extra free $20"?
22 Q.  And so let's make it a little more concrete.
23 Says, "If you trade this phone in and use your trade-in
24 to buy another phone, we'll subsidize that new phone."
25 Are you with me?

hg

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 110

1  A.  So I have a company that is a purchaser of used
2  phones and they are contacting consumers in this
3  hypothetical situation and they are saying, "We're
4  willing to pay you more for your phone"?
5  **Q.  Right.**
6  A.  In some format?
7  **Q.  Yes.**
8  A.  Okay.
9  **Q.  Does that not affect the supply side of the**
10 **equation?**
11 A.  That would affect -- so prices now go up and
12 more people should be willing to supply their phones
13 into the market since supply curves typically slope
14 upward.
15 **Q.  When you created your model, you did not**
16 **control for subsidies, did you?**
17 A.  We did not use trade-in prices in our model.
18 **Q.  And my question was when you created your**
19 **model, you did not control for subsidies, did you?**
20 A.  Which subsidies are you talking about?
21 **Q.  Any subsidies.**
22 A.  Subsidies for what?
23 **Q.  Did you, in your model, control for any**
24 **subsidies that would have been offered by any company to**
25 **incentivize the trade-in of a used iPhone?**

Page 111

1  A.  No.  We controlled for -- in this example, in
2  this model, we controlled for fixed effects for the full
3  interaction of phone model, phone condition, phone
4  carrier and phone storage size, and we also controlled
5  for color of the phone and new releases of -- we
6  controlled for new releases of new models of phones, as
7  well as monthly controls, seasonal and holiday controls.
8  That is what is in these specific models presented in
9  Table 2.
10      Sorry.  In addition to -- I apologize.  In
11 addition to the variables that are explicitly the
12 coefficients are listed in Table 2.  So that's in
13 addition to time, model age and measures for how well
14 the economy's doing, specifically US GDP.
15  Q.  So when you say "time," what do you mean by
16 "time"?
17  A.  That's just a variable that picks up time as it
18 goes on.  It's lower at the beginning of the data set
19 and it's higher at the end of the data set.
20  Q.  And model age is how long -- well, is measured
21 as of when?
22  A.  When the model was released.
23  Q.  When the model was released or when the
24 consumer bought the device?
25  A.  The model was released.



Page 148

1  BY MR. PILMER:
2       Q.   So for the record, Exhibit 89 is a one-page
3  document entitled "Verizon" page number 1.  It's a
4  document we received in the course of this litigation
5  from Verizon.
6            Is this the document that you were referring to
7  earlier that you had reviewed from Verizon?
8       A.   It could be.
9       Q.   Does it look something like this?
10      A.   I think it could -- maybe.  It's hard for me to
11 recall because I think we looked at it, and I think I
12 remember sending an email back to counsel saying, "I
13 don't think these are data.  This is a PDF.  Is there
14 data?"  And this seems consistent with that email that I
15 would have made to counsel.  "Is there a data set?  This
16 is a PDF."
17      Q.   And so where there are trade-in values for an
18 iPhone 4, 8 gigabyte, in March 2014 and it has a value
19 of ▮, you're saying that's not data?
20      A.   It is not the data that we requested.
21      Q.   If you look at, for example, Verizon's
22 reporting of trade-in values for an iPhone 4,
23 8 gigabyte, would you agree with me that for the
24 two months after April 2014, the trade-in value for that
25 device was higher than it was in April 2014?

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1  A.  Yes, it looks like the iPhone 4, 8 gigabyte,
2  was ▓ in May 2014 and ▓ in June 2014, if I'm reading
3  the spreadsheet correctly, relative to ▓ in April of
4  2014.
5  Q.  And likewise, the price of -- the trade-in
6  value of the 16 gigabyte iPhone 4 increased in May and
7  June, as compared to April, of 2014, correct?
8  A.  Sorry.  The 16-gigabyte iPhone 4?
9  Q.  Yes.
10  A.  Yes, the values in here are higher -- the
11  values displayed in this spreadsheet are higher in
12  May 2014 and June 2014 than in April 2014, and similarly
13  for the iPhone 4, 8 gigabyte, the values displayed in
14  this spreadsheet that we're looking at, so this is rows
15  1 and 2 in the -- what appears to be the trade-in value
16  box in this PDF, are ▓ and ▓ in May and April, and
17  ▓ in March.
18  Q.  And you would also agree that Verizon's
19  trade-in value for a 32-gigabyte iPhone 4 was higher in
20  May and June 2014 than it was in April 2014, correct?
21  A.  Well, I mean, I think this kind of displays the
22  challenge with the -- I'm just going to qualify how --
23  your question a little bit in that I don't really know
24  what this price is.  Is it an average, is it a mode, is
25  it a median?  I don't really know exactly how it was

hg

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 150

1   calculated, but the price that's displayed in this PDF
2   box, whatever this is, the trade-in value, is, in
3   April 2014, ▮; March 2014, ▮; and in May 2014 it was
4   ▮ for the row labeled "iPhone 4, 32 gigabyte".
5       Q.   And you have expressed opinions in this case
6   that the April 16th, 2014, expiration of a digital
7   security certificate is an event that caused harm,
8   right?
9       A.   Yes, it is an event, and I was asked to
10  determine whether there is economic evidence -- sorry,
11  evidence and economic methodologies common to the class
12  to determine class-wide impact and class-wide damages.
13  And I determined that those methodologies do exist and
14  are well relied on.
15      Q.   Are you expressing the opinion that the
16  April 16th, 2014, expiration of the digital certificate
17  caused harm?
18      A.   It caused a diminution in value of the iPhone
19  4, based on my analysis in the report.
20      Q.   And what, other than correlation, leads you to
21  believe there was causation from the expiration of the
22  digital certificate?
23           MR. WARSHAW:  Objection.  Form.
24           THE WITNESS:  I don't understand the question.
25  ///

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

1  BY MR. PILMER:
2      Q.   Well, correlation and causation are
3  two different things, right?
4      A.   Yes.
5      Q.   Okay.  So what leads you to the conclusion that
6  the expiration of the digital certificate on April 16th,
7  2014, caused injury to the class members as that's been
8  defined?
9      A.   So I am estimating a multivariate regression
10 model, and that multivariate regression model controls
11 for demand and supply factors, and it includes a dummy
12 variable or an indicator to capture the mean impact of
13 the period, the break, for iPhone 4s relative to other
14 phones versus before the break, and the assumption of
15 the break causing that harm is that conditional on those
16 demand and supply factors.  The break was an event that
17 is -- is not -- was not caused by factors affecting
18 demand and supply.
19     Q.   In fact, are you just not assuming that the
20 break caused the harm?
21     A.   Well, every model has exclusion restrictions or
22 assumptions, and then you ask whether those are
23 reasonable, and it's reasonable to conclude that the
24 break was not caused by demand and supply factors, that
25 you can control for those demand and supply factors and

Page 152

1  correctly estimate a but-for price, and that but-for
2  price reflects what the value would have been for the
3  phone but for the break.
4      Q.   Are you saying that your exclusion restrictions
5  lead you to conclude that there are no other
6  explanations for what you're calculating is the
7  diminution in value?
8      A.   Other than the break?
9      Q.   Yes.
10     A.   What it's saying is that this dummy variable
11 for the break is picking up a mean change in price that
12 is attributable to the break.
13     Q.   And when you say "a mean change in the price,"
14 you're talking about the price from April 16th, 2014,
15 through December 2016?
16     A.   I believe it's December 2016.  And it's
17 actually the log price.
18     Q.   Explain to us what the difference is between
19 price and the log price.
20     A.   Log price is just a transformation of price
21 that allows me to interpret the coefficient in the model
22 as a percentage diminution in value.
23     Q.   Now, you picked the end date of your mean
24 damage period as December 2016, right?
25     A.   That's the end date that is in the data.



Page 153

1  Q.  If the end date was in -- well, strike that.
2      Is there any logical connection between the --
3  what you call the break in April 2014 and prices for
4  iPhone 4 and 4Ss in December 2016?
5  A.  Sorry.  Can you repeat the question?
6  Q.  Yeah.  What's the logical connection between
7  the -- what you call the so-called break in April 2014
8  and the price of the used iPhone 4 in December 2016?
9  A.  The connection is that the break is picking up
10 the diminished mean value of the phone, and so that mean
11 shift in value impacts phones going forward in the --
12 you know, the level changes over time, time is in the
13 regression, but it's picking up, basically, a shift in
14 the path prices would have taken over time.
15 Q.  Right.  But you're saying that the expiration
16 of the digital security certificate caused a diminution
17 in value, and how is that expiration in April 2014
18 causative of a price impact in December 2016?
19 A.  Well, if there's a mean value that people
20 attribute to this less-functioning phone, a mean
21 diminution in value, that mean diminution in value could
22 impact prices for a long time.  It hasn't changed.  It's
23 a characteristic of the phone that's constant.
24 Q.  Well, you're assuming the phone is less
25 functioning, correct?

hglitigation.com



1  A.   I just threw that as an example.  I'm
2  incorporating everything that happened as a result of
3  the break in this -- in this damages period.
4  **Q.   And my question is:  You're assuming, as part**
5  **of that, that the iPhone 4 was less functioning in**
6  **December 2016 than it was in March 2014, right?**
7  A.   Well, I think that the diminution in value
8  doesn't require me -- I don't break up what factors led
9  to how much of each of the diminution in value.  This is
10 a mean diminution in value based on competitive market
11 prices using well relied on methodologies and evidence
12 that economists typically use when estimating damages.
13 **Q.   And so you did not break out what impact, if**
14 **any, that you calculated was due to what you have**
15 **assumed was a less functioning phone, right?**
16 A.   I'm picking up the diminution in value from the
17 break, so how did the market respond with equilibrium
18 prices, conditional, on-demand and supply factors after
19 the break for the iPhone 4, versus other models relative
20 to before the break.
21 **Q.   How long did it take the market for used iPhone**
22 **4 and 4Ss to reach an equilibrium price after**
23 **April 16th, 2014?**
24 A.   I did not -- I do not know off the top of my
25 head.

Page 155

1  Q. Well, how would you find out?
2  A. I'd have to think about that.
3  Q. Can you give me an answer?
4  A. No, it's not a relevant -- relevant for any
5  analysis, and so I haven't thought about that.
6  Q. Well, did the phones have an immediate
7  diminution in value on April 17th, 2014?
8  A. Well, I wouldn't expect them to have a full --
9  fully incorporate information because, as we can see in
10 the search data, there were a lot of searches going on
11 for a while, so I'm not sure.
12 Q. Would the market have reached its equilibrium
13 by April 20th, 2014?
14 A. I don't know the answer to that question.
15 Q. How about by May 1st, 2014?
16 A. I don't know the answer to that question.
17 Q. We've seen data now from a number of sources
18 that showed that the trade-in prices for iPhone 4 and
19 4Ss actually increased in the month and two after
20 April 16th, 2014. Would the market have reached its
21 equilibrium by the time those prices were going up?
22 A. Well, I think -- I want to repeat again that
23 diminution in value isn't a change in a mean price; it
24 is the estimated difference between what prices were and
25 what they would have been in a but-for world, and the

Page 156

1  but-for world is what prices would have been controlling
2  for a panoply of demand and supply factors but for the
3  harmful act, and I -- that -- that is not in Exhibit 89.
4      Q.   So in Exhibit 89, which is the Verizon
5  production, let's take the iPhone 4, 8 gigabyte,
6  trade-in value in May 2014 of ▮.  Do you see that?
7      A.   Yes.
8      Q.   Is your testimony that because of the event of
9  April 16, 2014, that that ▮ number should be
10 12.72 percent higher?
11     A.   No.
12     Q.   Would the trade-in value price data that's on
13 Exhibit 89 after April 14 -- April 2014 be, in your
14 mind, higher at any point in time?
15          MR. WARSHAW:  Objection.  Form.
16          THE WITNESS:  I just -- I don't understand the
17 question.
18 BY MR. PILMER:
19     Q.   Well, you've run a what you call a but-for
20 world, and my question is:  Under your analysis and
21 assessment, should those numbers for May 2014 for the
22 iPhone 4 and 4S devices have been 12.72 percent higher?
23     A.   I don't really know what these numbers are, so
24 unless you can explain to me exactly what these numbers
25 are, I don't think they're regression adjusted, I don't

Page 157

1  think they're any sort of point est -- I don't actually
2  know what they are.  So my answer is I don't know what
3  these numbers are.  I can't tell you anything about what
4  they should have been or what they are.  I don't know
5  what they are.
6       Q.   If you selected a different end date for your
7  damages period, let's say June 2014, would your
8  conclusions be different?
9       A.   So my conclusions in the report are that there
10 exist common data -- or common evidence and
11 methodologies of the type well relied on by economists
12 which can be used to assess whether there is class-wide
13 impact and assess damages -- class-wide damages,
14 aggregate damages.  And so my opinion is that those do,
15 in fact, exist.  I demonstrate them, and that opinion
16 would not change.
17      Q.   Would your conclusion that there was an implied
18 diminution in value of -12.72 percent be different if
19 you selected June 2014 as the end date of your damages
20 period?
21      A.   The number -12.72 percent coming from this
22 regression, if we cut off the data in June 2014, would
23 likely be different.
24      Q.   And in what way would it be different?
25      A.   Well, numerically, it's picking up a mean

Page 158

1  difference, and so the probability that any two means
2  are exactly the same is almost nothing.  It's a very
3  improbable event that you take two series of numbers and
4  they end up with exactly the same mean.
5      **Q.   Right.  So would your implied diminution in**
6  **value be higher or lower if you picked the end date for**
7  **your damages period of June 2014?**
8      A.   I would have to look and see.
9      **Q.   Did you do that analysis?**
10     A.   I did not look at that analysis.
11     **Q.   Did you run other regression models where you**
12 **determined that there was no implied diminution in value**
13 **as a result of the April 16th, 2014, event?**
14     A.   In the Best Buy data?
15     **Q.   In any circumstance.**
16     A.   I don't think I ran any models, at least that
17 made any sense that gave me a zero damages estimate.
18 But I'd have to go back and look.
19     **Q.   Did you ever run any models that led you to**
20 **conclude there was no impact on the value of phones from**
21 **the expiration of the digital security certificate?**
22     A.   Is that the question you just asked?  I thought
23 that was the question you just asked.
24     **Q.   So the answer is that you did or you did not?**
25     A.   I'm sorry.  Repeat the question again.



```
 1     A.   Again, I'm relying on the documents and on the
 2  complaint and evidence in the complaint, so I don't --
 3  this is my summary and background.  It's not maybe
 4  opinion in the case.
 5     Q.   So no lawyer gave you this language?  You came
 6  up with all this language yourself?
 7     A.   Well, I wrote this in conjunction with counsel
 8  in referring to the complaint and understanding the
 9  complaint put forth in the case in like a -- as much of
10  a layman's term as it can be put in.
11     Q.   Are you confident that you wrote this language
12  and didn't take it from somebody else?
13     A.   I am confident that this is my language, and I
14  may have been influenced by reading various documents,
15  maybe.  I don't know.  But this is language that I agree
16  with and the report is mine and I penned it, so . . .
17  Accelerated is kind of a nice, concise way to say it.  I
18  think it's more concise than "moved forward to earlier
19  in time" or something like that.
20     Q.   Or "coded"?
21          MR. WARSHAW:  Objection.  Form.
22          THE WITNESS:  Well, I don't think "coded"
23  captures the fact that the time period got shorter.
24  Even though it does have less syllables.
25  ///
```

hg

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 238

1        REPORTER'S CERTIFICATE

2

3              I, the undersigned, a Certified Shorthand

4  Reporter of the State of California, do hereby certify:

5              That prior to being examined, the witness

6  named in the foregoing proceedings was by me duly sworn

7  to testify to the truth, the whole truth, and nothing

8  but the truth;

9              That said proceedings were taken by me

10 stenographically and were thereafter transcribed into

11 typewriting under my direction, said transcript being

12 a true and accurate transcription of my shorthand

13 notes.

14             I further certify that I am neither

15 financially interested in the action nor a relative or

16 employee of any attorney of any of the parties.

17             IN WITNESS WHEREOF, I have this date

18 subscribed my name.

19             Dated: _____ _____, 2018.

20             *[signature: April D. Heveroh]*

21             _____
               April D. Heveroh, CSR, RPR, CCRR
22             Certified Shorthand Reporter
               in and for the State of California
23             License No. 8759
               Expiration Date:  December 31, 2018
24             Henjum Goucher Reporting Services
               1-888-656-DEPO

25