# EXHIBIT 4

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

```
                                                         Page 1
                                        VOLUME 1
                                        PAGES 1-242
                                        EXHIBITS: 183-192

              UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF CALIFORNIA

         CONTAINS CONFIDENTIAL BUSINESS INFORMATION
              SUBJECT TO A PROTECTIVE ORDER
                   ATTORNEYS' EYES ONLY

   -------------------------------
   CHRISTINA GRACE and KEN
   POTTER, Individually and
   On Behalf of All Others
   Similarly Situated
              Plaintiffs              Case No.
   vs.                                 5:17-cv-00551-LHK-NC
   APPLE INC.
              Defendant
   -------------------------------




   VIDEOTAPED DEPOSITION OF JUSTINE S. HASTINGS, Ph.D.
        Thursday, September 20, 2018, 8:33 a.m.
           Courtyard Marriott Providence Downtown
                  32 Exchange Terrace
                 Providence, Rhode Island
```


CERTIFIED TRANSCRIPT

```
   ---Reporter:   Joan M. Cassidy, CSR, RPR, RMR, CRR---
                  HG Litigation Services
           2777 N. Stemmons Freeway, Suite 1025
                   Dallas, Texas 75207
          Telephone 888-656-3376   Fax 888-656-3275
```

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 2

```
 1  APPEARANCES:

 2  Present for Plaintiff:
        Friedman Oster & Tejtel
 3      David F.E. Tejtel, Esq.
        240 East 79th Street, Suite A
 4      New York, New York 10075
        646-661-5881
 5      dtejtel@fotpllc.com
            -and-
 6      Caldwell Cassady & Curry, P.C.
        Daniel R. Pearson, Esq.
 7      2101 Cedar Springs Road, Suite 1000
        Dallas, Texas 75201
 8      214-888-4848  Fax: 214-888-4849
        dpearson@caldwellcc.com
 9

10  Present for Defendant:
        Durie Tangri LLP
11      Josh H. Lerner, Esq.
        Laura E. Miller, Esq.
12      217 Leidesdorff Street
        San Francisco, California 94111
13      415-362-6666  Fax: 415-236-6300
        jlerner@durietangri.com
14      lmiller@durietangri.com

15
    ALSO PRESENT:   Gabe Zeldin, Esq. (via telephone)
16                  Dr. Malhotra (via telephone)
                    Steven Baty, Videographer
17

18

19

20

21

22

23

24

25
```

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 75

1  the break, and I performed some calculations in my
2  merits report using that ▓▓▓▓▓▓ number, applying
3  the diminution-in-value estimates from my model to
4  that number.
5       I don't have information on where those
6  individuals live or exactly what those data are.  I
7  believe that information has been requested from
8  Apple repeatedly and has not been provided.
9     Q.  **So as of now you have not offered or**
10 **calculated diminution-in-value estimates for iPhone**
11 **4 and iPhone 4S users in California, correct?**
12    A.  Not specifically in California because I do
13 not have a list from Apple of users who were in
14 California.  My model diminution-in-value estimates
15 apply equally if I were given a list of users in
16 California or if I were given a list of users in the
17 nation.  I just need a list of users who were
18 affected by the break or phone owners who were
19 affected by the break and some sufficient
20 documentation to go with that list so that I can
21 correctly apply damages estimates.
22    Q.  **And the diminution-in-value estimates that**
23 **you offered in your merits report, those include**
24 **diminution in value for owners of jailbroken phones,**
25 **correct?**

```
 1   you want to keep going?
 2              THE WITNESS:  I don't know.  If it's a
 3   natural breaking time, we can take a break.
 4              MR. TEJTEL:  Do you want to take a
 5   break?
 6              MR. LERNER:  Yeah.  Like I said before,
 7   I'm not one of these people, "I've gotta finish this
 8   line."  It really doesn't matter to me.  I've been
 9   doing it for way too long, I could care less.
10              MR. TEJTEL:  Okay, we'll take a break,
11   then.
12              VIDEOGRAPHER:  The time is 10:38 and
13   we're off the record.
14              (Recess.)
15              VIDEOGRAPHER:  The time is 10:55 and
16   we're on the record.
17   BY MR. LERNER:
18      Q.  A couple more questions just about the
19   market so I can try and understand.  Would the
20   average price that the seller of a phone, meaning an
21   individual who trades it in, like me, for example,
22   might that be higher in California than -- again,
23   I'll just use New Mexico just 'cause it's the one
24   that comes to mind.  Might sellers of iPhone 4 and
25   4S's in the trade-in market get more for their phone
```

Page 80

1  in California than they do in New Mexico?
2           MR. TEJTEL:  Object to form.
3       A.  I'm sorry.  So are you referring to if
4  somebody in California goes into a Best Buy and
5  trades in their phone, would they receive more from
6  Best Buy for their trade-in in California than in
7  New Mexico?
8       Q.  Yeah.
9       A.  They could.  It would depend on Best Buy's
10 promotional incentives, what they were trying to
11 achieve with that price of the phone for their
12 larger business organization and profits, their
13 collective profits, their total profits and revenues
14 for Best Buy as a complete electronics -- you know,
15 as a large electronics retailer.
16      Q.  And could it also depend on the fact that
17 the seller of the phone is in California?
18          MR. TEJTEL:  Object to form.
19      A.  So again, we're talking about trade-in
20 prices; we're not talking about the market value of
21 used phones; we're talking about trade-in prices --
22      Q.  Mm-hm.
23      A.  -- which are not prices that are used in my
24 model, in my merits report.  And as is clear from
25 many industry facts and from the testimony of

hglitigation.com    

Page 81

1   industry experts in this case, those prices may
2   include many features -- many factors and objectives
3   that are not a part of the value of the phone
4   itself.  Those could vary from time to time and from
5   region to region based on the objectives of the
6   firm's buyback program.
7       Q.  And with respect to region to region, they
8   could vary based on, for example, I assume average
9   income in a state?
10      A.  I don't know.  They could.  I would need to
11  look into -- further into what are the models that
12  are being run by these companies, determining their
13  buyback programs.  That's not something that I can
14  speak to specifically.  It's not relevant for my
15  model or for my results.
16      Q.  And again, with respect to regions, it
17  could vary based on the condition of the phones
18  that, on average, are traded in in a given state,
19  right?
20          MR. TEJTEL:  Object to form.
21      A.  Again, I don't know.  I just have to
22  understand what the trade-in price function looks
23  like.  I don't have information on that.  It's not
24  part of my -- the specific functions are not part of
25  my model as I'm looking at the market value --

Case 5:17-cv-00551-LHK   Document 333-5   Filed 12/12/19   Page 8 of 17
GRACE: JUSTINE S. HASTINGS, Ph.D. - CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 82

1  Q. Do you know whether --
2  A. -- the market resale price, used market
3  resale price of phones.
4  Q. I apologize, I didn't mean to interrupt.
5        Do you know whether or not Californians
6  buy more smartphones than residents of other states?
7        MR. TEJTEL: Object to form.
8  A. I have not looked into whether Californians
9  buy more smartphones than residents in other states
10 in general as that fact is not relevant to the
11 opinions set forth in my reports.
12 Q. And I assume it's also not relevant if
13 Californians trade in their phones more often?
14 A. I don't know. It's -- again, I'm using the
15 market value of used phones and the diminution in
16 market value. I'm not looking at trade-in prices
17 for phones in my reports or trade-in -- not looking
18 at the market for trade-ins, meaning I'm not looking
19 at programs and policies specifically related to
20 trade-ins and using those for estimating diminution
21 in value to iPhone 4 and 4S's in this case.
22 Q. Right. And so the number of times, on
23 average, that Californians trade in their phones
24 versus residents of, say, New Mexico is not relevant
25 to your opinions, correct?

hglitigation.com
hg
REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 146

1  that claims process to assess his portion of the
2  aggregate damages which I have calculated.
3       Q.  Got it.  So whatever money would go to
4  Mr. Potter, as far as you understand, would be based
5  on a claims process pursuant to which he would get
6  some portion of the aggregate damages that you've
7  estimated?
8            MR. TEJTEL:  Object to form.
9       A.  Yes, so I'm providing aggregate damage
10 estimates.  There's a claims process, and that is
11 how Mr. Potter would receive his claim.  Though I'm
12 not a lawyer or part of that claims process in
13 particular, that's my general understanding.
14      Q.  And with respect to the regression analysis
15 that you did, you didn't restrict your analysis to
16 the resale prices of iPhone 4 and 4S devices that
17 were running only specific versions of iOS, right?
18           MR. TEJTEL:  Object to form.
19      A.  What do you mean by restrict my analysis?
20      Q.  For example, you didn't restrict your
21 analysis to only devices that were running iOS 6 or
22 earlier?
23      A.  Sorry.  Do you mean by that did I only
24 estimate my model using data on devices that were
25 running iOS 6 or earlier?

Page 147

1   Q. Correct.
2   A. I did not restrict my model to be estimated
3   only on data from phones that were running iOS 6 or
4   earlier.
5   Q. And the data sets that you have don't have
6   data on what version of iOS the devices were running
7   at the time they were traded in, correct?
8   A. These three data sets here, AT&T, Best Buy
9   and ecoATM, the version of iOS is not included as a
10  field in those data sets.
11  Q. And likewise, no data on iOS at the time of
12  resale?
13  A. There's no field in these data that I am
14  aware of that records what operating system was --
15  is running on these phones that were resold.
16  Q. You're aware that the phones that were
17  resold from Best Buy, for example, were using the
18  most recent version because they were flashed,
19  correct?
20  A. I recall this from testimony in the case,
21  that Best Buy says that they upgrade -- reflash the
22  phones. I can't say I completely understand if it's
23  reflash or flash. It seems that there's a confusion
24  among those two terms in the various testimonies,
25  but they flash or reflash, whichever way you want to

Page 148

1  say it, the phone and put the newest operating
2  system on it.  That's my recollection of the
3  testimony from experts, industry experts in this
4  case, at least one of them.
5      Q.  And likewise, the data sets that you have
6  do not provide information on the iOS that was
7  running at the time of the certificate expiration,
8  correct?
9           MR. TEJTEL:  Object to form.
10     A.  So are you referring to the time of the
11 break?
12     Q.  Sure.  I think not surprisingly, people in
13 the case call it different things.  The plaintiff
14 lawyers call it the "(Break)" in parentheses with a
15 capital B, and I call it a "certificate expiration,"
16 but we can call it whatever you want.
17     A.  Okay.  I just want to make sure we're
18 always talking about the same thing --
19     Q.  Yeah.
20     A.  -- so it's helpful to have a common name.
21     Q.  Great.
22     A.  So I think I refer to it in my report as
23 the "Break."
24     Q.  Yeah.
25     A.  And so --

1    MR. TEJTEL:  Object to form.
2       A.  That is the average price, the resale
3    price, as listed in or as seen in the AT&T data
4    during the month prior to the break for iPhone 4 and
5    4S models.
6       Q.  So I understand -- I don't necessarily
7    agree with it, but I understand why you use average
8    resale price before and after what you call the
9    break in order to calculate diminution in value.  I
10   get it.
11          What I don't understand is then once
12   you're done and you've come up with what you are
13   saying is the diminution in value, you then multiply
14   it against, for example, AT&T's average resale price
15   as opposed to what the average trade-in value would
16   have been that would have been received by, for
17   example, somebody selling their phone to an AT&T or
18   one of those entities.
19          MR. TEJTEL:  Object to form.
20      A.  Okay.  I'm sorry, is there a question in
21   there, or are you just stating what you don't
22   understand?
23      Q.  Yeah.  Can you explain to me why it is that
24   you are using, for example, AT&T's retail price to
25   multiply by the diminution in value in order to come

hg

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 191

1  up with your aggregate diminution-in-value estimate?

2       A.   As opposed to a trade-in price?

3       Q.   Yeah.

4       A.   So the reason for using the resale price is
5  that we are estimating the diminution in value to
6  the market -- diminution in value to the market
7  value, the used market value of the phone.

8            The trade-in price for AT&T, as you
9  know, is -- from my rebuttal report may include
10 discounts and promotions and ties to purchases of
11 other products that I don't have data on.  So, for
12 example, on page 36 of my rebuttal report, I state
13 that I considered the trade-in data carefully as
14 evidenced by detailed questions and illustrative
15 analysis of the data fields I sent to Best Buy, in
16 order to properly understand the data.  I determined
17 through that process in addition to other processes
18 that the data field was not suitable for the
19 purposes for estimating diminution in value of the
20 iPhone models affected by the break because it often
21 contains discounts and tie-ins to in-store purchases
22 of new products bundled in with the trade-in price,
23 thus preventing the econometrician from being able
24 to separately determine the diminished value of the
25 phone.

Page 192

1  So I don't have an estimate of the value
2  the individual received when they traded in their
3  phone because there are many things that are tied
4  into this trade-in price that the customer is
5  receiving or not receiving that I don't have in the
6  data.
7  **Q.  Which would make the trade-in value to the**
8  **customers high, right?**
9  A.  I don't know.  I do know that it's not the
10 value to the customer.  I know that the customer --
11 the market value of the price of the phone is
12 measurable, as I've demonstrated in my reports.  You
13 know, in Paragraph 37 I also say that my decision
14 follows best practices highlighted by the Federal
15 Trade Commission in a document that they wrote on
16 best practices.
17           As an example, in some industries we
18 analyze transaction level prices at the customer
19 level to understand differences in price across
20 customers as well as trends in price at the time.
21 Data maintained by companies sometimes do not
22 reflect rebates or discounts that are given in lump
23 sums rather than on an invoice.  Thus the invoice
24 transaction data may not reflect the true net prices
25 the customers pay.  So I state that instead of using

Page 219

1  A.  What's different in the model?
2  **Q.  Yeah.**
3       MR. TEJTEL:  Object to form.
4  A.  There are two different dependent variables
5  that are used, one of which is not actually picking
6  up value to the customer.  It may have other factors
7  in it as I discussed.  I think that this model was
8  run in comparison in the rebuttal report to address
9  concerns that Dana Trexler raised.  And so -- let
10 me just actually get to 1 -- so if you notice, there
11 are also slightly fewer phones or observations in
12 Table 2 of the rebuttal report, Column 4, than there
13 are in Table 1, Column 3, of the merits report, so
14 those are two differences.  And I would have to go
15 back and look at my code to understand if there are
16 any more differences.
17 **Q.  Okay.  And isn't that because you just used**
18 **revised GDP data?**
19      MR. TEJTEL:  Object to form.
20 A.  Isn't what because I used revised GDP data?
21 **Q.  The changes that you just described, don't**
22 **those reflect revisions, that GDP data?**
23 A.  I don't understand the question.  So I
24 think I just answered your question saying that
25 there were a couple of changes, there are a couple

Page 220

1  of differences between Table 2 and Table 1, Table 2
2  in the rebuttal report, Column 4, and Table 1 in the
3  merits report, Column 3, including the dependent
4  variable.  So we're using a dependent variable in
5  Table 1 which is the resale value of a phone in a
6  well-established and robust competitive market for
7  used phones.  We're using the full time period.
8            And in Table 2, in the rebuttal report,
9  Column 4, we are using trade-in value that includes
10 several factors in how it is established and a time
11 period to match the Best Buy data in response to a
12 question from Dana Trexler.
13           I do also believe that when we ran the
14 models in Table 1, we did check to see if there were
15 updates to the Bureau of Economic -- U.S. Bureau of
16 Economic Analysis per capita GDP series that we
17 used -- they revise those often -- and we used the
18 most up-to-date models as we would ex -- or the most
19 up-to-date data for GDP, as one would expect to use
20 when trying to use the best data available to answer
21 the question at hand.
22      Q.  And is that what accounts for the change in
23 N?
24           MR. TEJTEL:  Object to form.
25      A.  Is that what accounts for the change in N?



hglitigation.com

REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Page 241

1      CERTIFICATE OF COURT REPORTER

2           I, Joan M. Cassidy, Registered

3  Professional Reporter and Certified Realtime

4  Reporter, do certify that the deposition of Justine

5  S. Hastings, Ph.D., in the matter of C. Grace & K.

6  Potter, Individually & On Behalf of All Others

7  Similarly Situated v. Apple Inc., on September 20,

8  2018, was stenographically recorded by me; that the

9  transcript produced by me is a true and accurate

10 record of the proceedings to the best of my ability;

11 that I am neither counsel for, related to, nor

12 employed by any of the parties to the above action;

13 and further that I am not a relative or employee of

14 any attorney or counsel employed by the parties

15 thereto, nor financially or otherwise interested in

16 the outcome of the action.

17

18             *[signature: Joan M. Cassidy]*

19             _____
             Joan M. Cassidy, RPR, CRR
             Commissioner in the State of Rhode
20           Island and Providence Plantations
             Commission expires May 31, 2022

21

22

23

24